IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,443






EX PARTE BRODGERICK TREDON ELLIS, Applicant









ON APPLICATION FOR A WRIT OF HABEAS CORPUS

CAUSE NO. 2-02-241A IN THE 382ND

JUDICIAL DISTRICT COURT ROCKWALL COUNTY





 Keasler, J., delivered the opinion for a unanimous Court.



O P I N I O N



 Brodgerick Tredon Ellis was convicted by a jury of possession of cocaine. After his
appeal was affirmed, Ellis filed an application for a writ of habeas corpus claiming that his trial
counsel rendered constitutionally ineffective assistance when he offered evidence of Ellis's
prior criminal history during the guilt phase of his trial. We disagree and deny relief. 

Factual and Procedural Background

 Brodgerick Tredon Ellis was a passenger in a truck driven by Kedrian Davis. Rockwall
County Deputy Donahoe stopped Davis for failure to display a front license plate and failure
to maintain a single lane of traffic. Deputy Donahoe testified that when he pulled the truck
over, Ellis became immediately "confrontational" and "aggressive." Deputy Donahoe asked
Davis to step out of the truck and questioned him about their travel. Deputy Donahoe then
asked Ellis to get out of the truck, asked him the same question, and received an answer that
was inconsistent with Davis's statement. Deputy Donahoe checked the ownership of the truck
and discovered that it was not registered to either Davis or Ellis. When the prosecutor asked
Deputy Donahoe if he looks for "specific clues or red flags" during a traffic stop that indicate
"that certain criminal activity may be taking place[,]" Deputy Donahoe stated "nervousness is
a big one [and] [t]hird party owner to a vehicle." Explaining why third-party ownership is
important to trafficking drugs, Deputy Donahoe stated that "if they're caught with narcotics and
they own the vehicle outright, we can seize the vehicle from them. So a lot of times they'll
rent a car or be in someone else's car so we can't take it from them."

 Due to the circumstances surrounding the stop of Davis and Ellis, Deputy Donahoe
requested and received consent from Davis to search the truck. Deputy Donahoe searched the
truck and found what he described as two "cookies," each in a separate plastic bag, in the
middle of the cab behind the front seats. Deputy Donahoe testified that neither Davis nor Ellis
showed any shock or surprise when he discovered the substance and performed a field test,
which indicated that the "cookies" were cocaine. When Deputy Donahoe asked Davis if he
knew anything about the cocaine, Davis replied that "one of his hoes must have put it there." 
And when Deputy Donahoe asked Ellis the same question, Ellis stated that "he didn't know
anything about it." Deputy Donahoe testified that when he searched Ellis and Davis, he
discovered a large amount of cash on Davis and twenty-six dollars on Ellis. 

 When defense counsel began his cross-examination of Deputy Donahoe, he
immediately referred to the deputy's report from the traffic stop. He then offered the report
into evidence. The prosecutor noted that the report was inadmissible, stating "an offense
report is not admissible,[ (1)] but we'll let it in. We have no objection." The trial judge admitted
the report into evidence.

 Defense counsel then cross-examined Deputy Donahoe by referencing specific parts
of the report. Defense referred to the part of the report in which Davis admitted to Deputy
Donahoe that he was on probation for possession of marijuana. Using the report on redirect,
the State was able to elicit testimony about Ellis's criminal history. 

 Prosecutor: So why don't we let the jury hear everything that the
defense didn't bring to you. And would you just
read--start at line--No. 4 and read the whole line for the
jury.


 Deputy Donahoe: "Davis advised me that he was currently on probation for
possession of marijuana, 4 ounces to 5 pounds. Ellis
advised me that he was on parole for robbery, but a
criminal history check from dispatch showed only a
murder charge."

. . .

 Prosecutor: So you did have in your report that Brodgerick Ellis, the
person you later found out was on parole for robbery and
had a charge for murder, was the one that was
confrontational with you; is that correct?


 Deputy Donahoe: Correct.


 Just days before Ellis's trial, Davis entered into a plea agreement with State. The plea
agreement provided that Davis would plead guilty to possessing part of the cocaine seized by
Deputy Donahoe and testify truthfully against Ellis and that the State, in exchange, would
recommend three years' imprisonment and a fine of $1,000. The agreement further provided
that Davis would be subject to an aggravated perjury charge if he did not testify truthfully.

 At Ellis's trial, on direct examination by the prosecutor, Davis admitted that he accepted
the plea agreement and testified about its terms. Davis also linked Ellis to one of the cocaine
"cookies" found in the truck. Davis testified that it was Ellis's idea to go to Dallas and
purchase cocaine and that Ellis had arranged the purchase. Davis stated that he borrowed the
truck and offered to drive because Ellis "had stitches in his leg." According to Davis, each of
them purchased a "cookie" and then placed them together in the truck between the driver and
passenger seats before heading back to Paris, Texas. 

 The jury convicted Ellis of possession of a controlled substance in an amount of four
grams or more but less than two hundred grams, and the trial judge sentenced him to fifteen
years' confinement. Ellis appealed, arguing that: (1) "his conviction was improperly based on
uncorroborated accomplice witness testimony"; and (2) "the trial court erred in failing to grant
a mistrial due to the prosecutor's comment on [Ellis's] failure to testify." (2) Finding no merit
to either argument, the Dallas Court of Appeals affirmed the trial court's judgment. (3)Habeas Proceedings

 Ellis filed this application for a writ of habeas corpus alleging, among other things, that
his trial counsel rendered ineffective assistance. Ellis claims in his second ground for review
that his trial counsel's decision to introduce the police report alone denied him effective
assistance of counsel because it allowed the jury to hear about his conviction for robbery and
a murder charge, both of which would have otherwise been inadmissible. Ellis also points to
several additional specific instances of alleged deficient conduct by his trial counsel, which
he asserts cumulatively prejudiced his defense:


 Trial counsel failed to interview the accomplice witness, Kedrian Davis,
and therefore failed to discover that Davis refused consent to search to
the officer. This could have been used to file a motion to suppress the
evidence seized during the search.


 


 Trial counsel failed to object to tampering with the cocaine evidence.


 


 Trial counsel failed to challenge the State's failure to establish a proper
chain of custody for the cocaine evidence.


 


 Trial counsel failed to object to the prosecutor's false statements to the
jury that Ellis lived in Paris and that he traveled over one hundred miles
round trip to Dallas County to pick up the cocaine. Ellis contends he
actually lived in Dallas County, so the prosecutor's statement was false,
and trial counsel should have introduced evidence that would have
established Ellis's residence as Dallas County.


 


 Trial counsel failed to impeach the credibility of the accomplice witness
by highlighting the fact that the accomplice witness was on probation for
possession of marijuana to the jury.


 


 Trial counsel failed to investigate Rockwall County's jury duty
procedures, which Ellis asserts are discriminatory against African-Americans.


 


 Trial counsel conducted an ineffectual voir dire.


 


 Trial counsel failed to request a limiting instruction under Texas Rule of
Evidence 404 regarding the extraneous offenses in Ellis's criminal
history.

 Trial counsel failed to show the letter written to Ellis by the accomplice
witness asking Ellis to "take the rap" for the offense, which Ellis asserts
"clearly established who[se] drugs they were," to the prosecutor before
trial. If trial counsel had done so, Ellis asserts that the prosecutor may
not have pursued charges against him.

 Trial counsel failed to timely file a notice of appeal on Ellis's behalf,
which Ellis had requested.


 


 Trial counsel failed to effectively cross-examine the accomplice witness
by failing to establish the inconsistencies in his testimony.


 Because we determined that additional information was necessary to resolve Ellis's
claims, we remanded Ellis's case to the convicting court for findings of fact and conclusions
of law and an affidavit from trial counsel.

 On remand, the trial judge held an evidentiary hearing at which Ellis's trial counsel
testified. Counsel explained that he did not have a "perfect recollection" of Ellis's case,
primarily because he had been undergoing treatment for cancer. But counsel attempted to
answer most of Ellis's allegations of ineffective assistance.

 Regarding the introduction of the police report, counsel explained that he intended to
use the report to impeach the testimony of Davis "relative to [Ellis] having possessed drugs,
having had anything to do with drugs." He also testified that he intended to show that Ellis's
"history was one of robbery. He had been convicted of robbery. He had served his time. He
had made parole early. And to me, that's an argument that he has been to a degree an exemplary
person[.]" Counsel stated that he wanted to show the jury that "there's nothing to connect
[Ellis] or tie him to these drugs except the testimony of Mr. Davis who had cut a deal" and that
Ellis had been honest with the police at the scene by revealing his robbery conviction. He
claimed that, short of Ellis testifying--which he declined to do--counsel knew of no way to
impeach Davis other than by using the police report. Summarizing his strategy on offering the
police report, counsel explained:

 I thought the police report was a way to establish, among other things, that
there's nothing in [Ellis's] background as of the day he was arrested to indicate
he had any involvement in drugs and that the only reason he was in that car was
to catch a ride with Mr. Davis and that the only person who ever said that Mr.
Ellis had any involvement in drugs was the gentleman he was riding with. And
all that was part of the police report.

. . .

 It was better to have something said to the jury about [Ellis's] prior conduct than
to say nothing at all. If you say nothing at all, the jury may assume, well, he
didn't want to talk because he's been dealing in drugs. So by showing his record,
by saying this man was convicted, he did his time, he's an exemplary parolee, to
me that's saying this man hasn't done anything but catch a car ride with this man
to wherever he was going. That's all that was available.

. . .

 I was going by way of suggestion to the jury that the absence of anything to the
contrary - - the absence of any evidence to the contrary would only lead to one
conclusion, that this person is all right. He's a good - - he's trying to make
good on his parole. That was what I was trying to show.

. . .

 Based on what we had, as I said, through innuendo, assumption, or whatever, I
wanted that jury to start to believe that this was a person who would not have
done what they said he did, because there's nothing to imply that he did it except
the fact that he was in the car.


 But counsel also testified at the writ hearing that he believed that "if the jury read that
[Ellis had a murder charge in his criminal record,]" Ellis would be "a gone goose." Counsel
admitted that the police report could not have been offered by the State at the guilt phase of
trial, though he argued that his admission was looking in "hindsight." 

 Counsel also claimed that he was being asked to consider his strategy in hindsight when
the State questioned him at the writ hearing: "So your testimony . . . is that you put this police
report into evidence to show some good conduct on Brodgerick Ellis' part." In response,
counsel stated:

 Let me put it this way, because you're asking me now to testify in hindsight, but
I'm sure that was the purpose. But more important than that, this record shows
that this man has a clean record since making parole. And that's what I was
trying to get into the record, that he was clean[.]


 After the hearing, the trial judge entered the following relevant findings of fact:

 The [police] report, including the prior conviction[,] was offered into evidence
by defense counsel and admitted without objection. As such, there is no legal
impediment to the admission of Applicant's prior conviction.

 

 Defense counsel utilized the police report both on cross examination and in
closing argument to impeach the credibility of co-actor, Kedrian Davis. 
Defense counsel further utilized the report to establish that his client
(Applicant) had been honest with the arresting officer by admitting that he was
on parole for robbery, that he was an exemplary parolee, and to show that
although his client had a criminal history, he had no such history for drug
offenses.


 It appears from the record at trial as well as from defense counsel's testimony
at the . . . hearing that the police report was intentionally offered into evidence
as part of a trial strategy to impeach the State's witness, Kedrian Davis, and to
bolster Applicant's credibility. 

 The trial judge also entered conclusions of law. Relevant to Ellis's claim concerning
the admission of the police report, the trial court concluded:

 Defense counsel's decision to introduce the police report[,] which resulted in
the publication of Applicant's criminal history to the jury[,] was part of an
intentional strategy to impeach the State's primary witness, accomplice Kedrian
Davis[,] and to bolster the credibility of the Defendant. While such strategy is
perhaps subject to question and could have conceivably caused some degree of
prejudice to [Ellis], there was at least a reasonable basis and explanation for
employing the strategy.


 Defense counsel's overall conduct at trial[] was consistent with and did not fall
below the standard of reasonable legal representation. 

 

 After reviewing the record, we filed and set Ellis's application for a writ of habeas
corpus to determine whether Ellis's trial counsel rendered ineffective assistance. We agree
with the trial judge's conclusion and hold that Ellis was not denied effective assistance of
counsel at trial.

Law and Analysis

 "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's
conduct so undermined the proper functioning of the adversarial process that the trial cannot
be relied on as having produced a just result." (4) In analyzing claims of ineffective assistance
under the Sixth Amendment, we apply the two-part framework announced by the United States
Supreme Court in Strickland v. Washington. (5) Under this framework, Ellis must prove by a
preponderance of the evidence that: (1) "his counsel's performance was deficient"; and (2)
"there is a 'reasonable probability'--one sufficient to undermine confidence in the result--that
the outcome would have been different but for his counsel's deficient performance." (6) 

 To establish deficient performance, Ellis must show that "counsel was not acting as 'a
reasonably competent attorney,' and his advice was not 'within the range of competence
demanded of attorneys in criminal cases.'" (7) Ellis must overcome the "strong presumption that
counsel's conduct fell within the wide range of reasonable professional assistance." (8) 
Therefore, Ellis must "overcome the presumption that, under the circumstances, the challenged
action might be considered sound trial strategy." (9) Although the Supreme Court has said that
"strategic choices made after thorough investigation of law and facts relevant to plausible
options are virtually unchallengeable[,]" (10) an attorney's cited strategy does not prevent us from
determining whether a specific act or omission was "outside the wide range of professionally
competent assistance." (11) The reasonableness of an attorney's performance is judged according
to the "prevailing professional norms" (12) and includes an examination of all the facts and
circumstances involved in a particular case. (13) Reviewing courts "must be highly deferential to
trial counsel and avoid the deleterious effects of hindsight." (14) 

 Under the second part of the Strickland analysis, Ellis must establish that the
"constitutionally deficient performance prejudiced his defense--that is, he must show that
'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the
proceeding would have been different.'" (15) "A reasonable probability is a probability sufficient
to undermine confidence in the outcome." (16) When making this determination, any
constitutionally deficient acts or omissions will be considered in light of the "totality of the
evidence before the judge or jury." (17) 

 Morever, when considering a trial judge's findings of fact, we give "almost total
deference" to those findings when they are supported by the record, "especially when those
findings are based upon credibility and demeanor." (18) We review a trial judge's conclusions of
law de novo. (19) 

 In his brief, Ellis argues that trial counsel's decision to introduce the police report was
not a sound trial strategy. He contends that any advantage gained by impeaching Davis's
credibility with the fact he was on probation for marijuana possession was outweighed by the
admission of Ellis's criminal record, "particularly when it refers to an unsubstantiated murder
charge[.]" Ellis maintains that trial counsel's other reasons--"to show that Applicant was an
'exemplary person[,]' made parole early, and had no prior convictions for drugs"--are not
supported by any information contained in the police report, and therefore counsel's decision
to offer the report "cannot be dismissed as a rationale or sound trial strategy." 

 To the contrary, the State argues that, although counsel's strategy was unsuccessful, it
was not unreasonable. According to the State, counsel "introduced the report only after
weighing the negative implications of applicant's criminal history against the benefits of
offering the report." The State argues that counsel "determined it would be better to use the
report to impeach co-actor Davis and bolster the credibility of his client than to say nothing
and let the jury speculate as to [Ellis's] role in the offense." 

 We conclude that trial counsel's strategic reasons for offering Deputy Donahoe's
police report were not unreasonable according to prevailing professional norms as required
under the first prong of the Strickland framework. Although the defensive course chosen by
counsel was risky, and perhaps highly undesirable to most criminal defense attorneys, we
cannot say that no reasonable trial attorney would pursue such a strategy under the facts of this
case. (20) 

 Deputy Donahoe's testimony supplied only circumstantial evidence of Ellis's
knowledge. Because the cocaine was discovered behind the console between the driver and
passenger seats of the truck, his testimony left unresolved the issue of which individual, Davis
or Ellis, was in possession of the cocaine. The testimony of Davis, an accomplice, although
sufficiently corroborated by non-accomplice evidence, (21) was the only direct evidence
connecting Ellis to one of the cocaine "cookies" seized by Deputy Donahoe. Ellis's
conviction depended entirely on the credibility of Davis. The theory of the case offered by
counsel was that Ellis was in the wrong place at the wrong time. Counsel's trial strategy
therefore was to convince the jury that it was Davis who possessed both of the "cookies." To
effectuate this strategy, counsel had to undermine Davis's credibility and, at the same time,
bolster that of his client. Our review of the trial record shows that counsel, consistent with his
testimony at the evidentiary hearing, utilized Davis's and Ellis's criminal histories to
accomplish these objectives. 

 We begin by examining counsel's use of Davis's prior possession of marijuana offense. 
During his cross-examination of Davis, counsel honed in on the prior possession offense and
asked Davis to identify where he had purchased the marijuana, who he had purchased it from,
and how much he had purchased. In pursuing this line of questioning, counsel attempted to
establish a prior connection between Davis and the cocaine dealer in Dallas and to emphasize
the amount of marijuana Davis purchased. Davis testified that he purchased a pound of
marijuana from a man named Fox somewhere near New Boston. While Davis was answering
the questions, counsel, in response to the prosecutor's relevancy inquiry, stated, "We're talking
about the fact that this guy's a drug dealer, your Honor." The trial judge noted that the subject
had been "opened up." 

 In cross-examining Davis, defense counsel also focused on Davis's attempt to convince
Ellis to take responsibility for all of the cocaine. In response to a long line of questions from
defense counsel, Davis admitted that he had sent a letter to Ellis telling Ellis that he would give
money to Ellis's mother and put money in Ellis's prison account if Ellis agreed to take the
"rap." In the letter, Davis asked Ellis to take responsibility for cocaine because Davis had
children and because he had "a dude waiting to give [him] something big." Seizing on the latter
statement, counsel tried to emphasize Davis's continued involvement with drugs:

 Defense Counsel: I'm concerned about this 'something big' that somebody was to
give you. Could it be you were waiting for a big delivery?


 Davis: Nah, money.


 Defense Counsel: Hunh?


 Davis: Money.


 Defense Counsel: When you say - - you're talking about big money, and you
weren't working. What were you going to do to get this big
money?


 Davis: I have friends.


 Defense Counsel: You have friends that are drug dealers, aren't they?


 Davis: No.


 Defense Counsel: And you're a big drug dealer, aren't you?


 Davis: Nah. 


 Defense Counsel: And you wanted this man to go to jail so you can stay out on the
street and continue to deal drugs, didn't you?


 Davis: No. 

 

 Trial counsel attempted to further highlight Davis's involvement with drugs by
questioning Davis about the amount of money he had possessed when he was arrested by
Deputy Donahoe. The testimony revealed that Deputy Donhoe had seized $1,450 from Davis. 
Davis testified that the money he used to purchase the cocaine came from selling cocaine and
shooting dice. He also stated that $1,450 belonged to his girlfriend and that he had withdrawn
it from a credit union account before leaving for Dallas. During cross-examination, defense
counsel was able to establish that the money belonged to Davis and that his girlfriend had lied
when she had claimed the money was hers after Davis's arrest. Defense counsel then tried to
use this to show Davis's knowledge of law relating to forfeiture:

 Defense Counsel: Isn't it a fact that this claim that this money belonged to your
girlfriend is nothing but - - for want of a better word, a lie?


 Davis: A lie?


 Defense Counsel: Yes.


 Davis: No.


 Defense Counsel: And aren't you saying that to avoid forfeiture?


 Davis: No.


 Defense Counsel: Just like you said everything else to avoid the consequences of
your conduct?


 Davis: If they want to take it, they was [sic] to take it.


 Counsel raised the forfeiture subject a second time when questioning Davis about the
truck:

 Defense Counsel: You know if you don't get caught in your own car, there's a
chance that the car can't be confiscated or attached or seized. 
You know that, don't you?


 Davis: No, not really. The truck was seized.


 Defense Counsel: I mean, but it was impounded. Even if they seize it - - 


 Davis: Well, they told me they was going to seize it.


. . .


 Defense Counsel: So what you want this jury to believe is that except for the fact
you got caught with these drugs, it was your cousin's car that you
were in, just coincidentally I suppose. It was your girlfriend's
money that you were holding, although you took it out of your
account. But you want them to believe that's her money, right? 
You want the jury to believe that this man over here, Mr. Ellis,
rode - - did he ride to Dallas with you to get the drugs?

 

 In an effort to deflect culpability away from Ellis, defense counsel continuously
emphasized Davis's involvement with drugs during his closing argument:

 [N]othing objective places those drugs under the control of Brodgerick Ellis,
nothing except opinion.

 They didn't find the drugs on Brodgerick. They didn't find them under his
seat. They found them in the console.

 And who talked about ownership of the drugs out there? Not Brodgerick
Ellis. Kedrian Davis said, "One of my hoes probably left them in there." And
for you all that are familiar with the street life, you know what that term means. 
And for all of you who are familiar with the life of drug dealers, you know what
that term means. Drug dealers make a lot of fast money and they spend a lot of
money fast and they spend it on their hoes. 

 That's all we have about how the drugs got in the car. But it doesn't
implicate [Brodgerick Ellis].

. . .

 Now we come to Mr. Davis, and I don't know where to start. You heard
all the evidence, and what did he say? He said some of everything. But he said,
in so many words by his statements, that he was - - he's not now, because he's
in jail - - but he was a big-time drug dealer. He didn't deal in nickels and
dimes. You don't buy 10 pounds of marijuana, 5 pounds of marijuana, or
however much he bought, if you're a small-time drug dealer. You're big. And
that's my opinion. 

. . . 

 He's on probation for drug dealing, possession. Who possesses 5 pounds of
marijuana for their own use? Nobody.


 Counsel also referred to the amount of money Deputy Donahoe discovered on Davis
and argued its significance in relation to Davis's involvement with drugs:

 [T]he majority of the money was in the possession of Kedrian Davis. That's
indicative of a drug dealer, because they have large sums of money.

 I don't know - - I shouldn't say this, but I don't know many drug dealers
who don't carry, don't have large sums of money. It's the nature of their
business to carry large sums of cash in all denominations.

 Mr. Davis would have you believe he went to the bank, credit union, and
drew out money to buy drugs. Let's assume that he did that for a moment and
that the money he had left was his and the money he had left was in the small
drug dealer denominations, not the hundred dollar bills that you would expect. 
But when you're dealing on the street, you have change. You buy - - you sell
the drugs, a $20 rock, a $30 rock, or a $10 rock. And that's the kind of money
you have in your pocket, and that's what this man had.

. . . 

 And here's a man with $26 in his pocket, and he's a drug dealer? And here's a
man who on the same day handled $3,000 $4,000. We know he's a drug dealer. 



 Turning to the letter that Davis sent to Ellis, counsel stated that Davis


 wanted to stay out of jail because he was expecting something big. Now, what
does that mean? You all watch enough television. You know what that means. 
It means a big buy is going down. There's going to be big bucks, and I'm going
to give you big money if you take this rap and I get out and get money. 


 And directing the jury's attention to the forfeiture issue, counsel argued that Davis is


 smart. He knows how to cover himself and cover his tracks. He borrowed that
car. He drove that car. What reason is there, when you think about it, for not
driving the car owned by Kedrian Davis? Even if Mr. Ellis could not drive, what
reason is there for not driving Mr. Davis' car, other than he didn't want to run the
risk of getting caught and having to forfeit his car? Because, you know, we have
the forfeit statute. And if you get caught doing certain types of criminal activity,
everything used in the commission of that criminal activity would be forfeited. 


 Our review of the record establishes that Davis's involvement with drugs was a recurring
theme throughout counsel's cross-examination of Davis and his closing argument. The
admission of Davis's prior possession offense provided the necessary foundation for counsel
to develop evidence that ultimately allowed counsel to argue that Davis was a seasoned drug
dealer. By depicting Davis this way, counsel was able to strengthen his trial theory--that the
two "cookies" belonged to Davis. 

 Next, we turn to counsel's use of Ellis's robbery conviction and murder charge. As the
trial court recognized, the admission of the robbery conviction and murder charge "could have
conceivably caused some degree of prejudice" to Ellis's defense. Robbery is considered a
serious and violent offense. And murder is considered the most serious and violent offense. 
So, even though Ellis's criminal history, as presented to the jury, did not include any drug-related offenses, it showed that Ellis was a dangerous criminal. A rational jury could have
concluded that if Ellis was involved in robbery and murder, he was guilty of possessing
cocaine, a less serious and non-violent offense, despite the absence of a criminal history
involving drugs. 

 Nevertheless, the admission of the robbery conviction and murder charge did serve a
strategic purpose. Although potentially detrimental on the one hand, their admission was
potentially beneficial on the other. Because Ellis's criminal history did not include any drug-related offenses, it diminished the likelihood of his involvement here. When coupled with the
evidence and arguments made by counsel concerning Davis's extensive involvement with drugs,
Ellis's criminal history strengthened counsel's theory of the case. A rational jury considering
both Ellis's and Davis's criminal histories could have concluded that Davis was the sole
possessor of the cocaine when weighing the evidence in this case. 

 Counsel also used Ellis's robbery conviction and parole status to boost Ellis's
credibility. Counsel made a point of showing that Ellis had been candid with Deputy Donahoe:

 Defense Counsel: Y'all made a big deal out of the fact that he had been charged with
murder, didn't you?


 Deputy Donahoe: Yeah, I tend to get a little nervous when I find out I'm
dealing with someone who's been charged with murder,
yes, sir.

. . .

 Defense Counsel: You think if he was trying to hide something, he would have told
you, "I'm a convict, I'm on parole?" Wouldn't he have lied don't
you think? 


 Deputy Donahoe: Are you asking me if I thought he was trying to hide drugs. Would
he not tell me that he was on parole?


 Defense Counsel: No, no, I'm just talking about his criminal history period.


. . .

 Defense Counsel: Based on your experience as a police officer, don't you find or
have you not found that people lie about their criminal history?

 Deputy Donahoe: Sometimes, yeah.

 

 Defense Counsel: Yes. Especially someone charged with a crime as serious
as you have alleged that Mr. Ellis was charged with?

 

 Deputy Donahoe: I don't come across murder charges that often. 

 

 Defense Counsel: And you don't come across people confessing to a murder
charge, if he did, do you?

 

 Deputy Donahoe: I wouldn't be in the position for a confession. I mean, I
just call for the criminal history from dispatch, and it tells
me what they've been charged with.


When considered with counsel's other tactics, the evidence of Ellis's honesty was an additional
fact that made counsel's theory of the case more plausible. (22) 

 We now consider counsel's remaining reasons for admitting the report--to show that
Ellis was an "exemplary person" because he "made parole early" and was a good parolee. Other
than the fact that Ellis told the deputy he was on parole for robbery, the report, as Ellis argues,
contains no information about Ellis making early parole or being a good parolee. Counsel
failed to offer any evidence to support that conclusion. Counsel did, however, talk about the
fact that Ellis had been paroled:

 Mr. Ellis previously committed a crime, robbery. He went to jail for robbery. 
He served his time. As a matter of fact, his time was so good that he got out
early. Parole means you've been a model prisoner and we're going to take a
chance on completely rehabilitating you so you can get back in society and be
a useful citizen. That's what parole is all about. 


Counsel, therefore, contrary to his testimony at the writ hearing, did not offer the report to
show that Ellis was paroled early. When talking about Ellis having been paroled early it is quite
possible that counsel meant to say that he wanted to show that Ellis was released from custody
early. Counsel did use Ellis's parole status to demonstrate that Ellis was rewarded for his good
conduct while serving his sentence for robbery by being released on parole before completing
his sentence. And, it is possible that, in line with counsel's contentions at the evidentiary
hearing, the jury could reasonably infer that Ellis had been "exemplary on parole" based on the
fact that the State did not present anything negative about Ellis's conduct after his release on
parole. Ellis's parole status was used to bolster Ellis's credibility and, consequently, counsel's
defensive theory. Therefore, we cannot conclude that counsel's use of Ellis's parole status
served no strategic value to Ellis's defense. 

 We conclude that counsel's decision to offer Deputy Donahoe's report was based on
a sound trial strategy. Counsel's strategy, as executed, was designed to persuade the jury that
all of the cocaine belonged to Davis. And although the means adopted by counsel were risky,
we cannot ignore the fact that counsel's tactics could have achieved the desired result (23)--an
acquittal for Ellis. Therefore, we agree with the trial judge and hold that Ellis has not shown
that counsel's performance was deficient as contemplated by the first Strickland prong.

 Finally, after reviewing Ellis's remaining claims of ineffective assistance, we conclude
that they are without merit, either as individual claims or cumulatively. Ellis has failed to
prove by a preponderance of the evidence that counsel performed deficiently. (24) 

Conclusion

 We hold that Ellis's trial counsel rendered constitutionally effective assistance and
therefore deny all relief. 


DATE DELIVERED: September 12, 2007

PUBLISH
1. See Tex. R. Evid. 404(b), 802, 803(8)(B).
2. Ellis v. State, No. 05-02-01851-CR, 2004 Tex. App. LEXIS 295, at *1 (Tex.
App.--Dallas Jan. 13, 2004, no pet.) (not designated for publication).
3. Id. at *7.
4. Strickland v. Washington, 466 U.S. 668, 686 (1984).
5. Ex parte Chandler, 182 S.W.3d 350, 353 (Tex. Crim. App. 2005) (citing
Strickland, 466 U.S. at 686); see also Hernandez v. State, 726 S.W.2d 53, 57 (Tex. Crim.
App. 1986).
6. Ex parte Chandler, 182 S.W.3d at 353 (citing Strickland, 466 U.S. at 694).
7. Id. at 354 (quoting Strickland, 466 U.S. at 687).
8. Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999) (citing Strickland,
466 U.S. at 668); Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994)).
9. Miniel v. State, 831 S.W.2d 310, 323 (Tex. Crim. App. 1992) (citing Strickland,
466 U.S. at 689).
10. Strickland, 466 U.S. at 690.
11. Id.; see also Ex parte Robertson, 187 S.W.3d 475, 483-86 (Tex. Crim. App.
2006); Ex parte Varelas, 45 S.W.3d 627, 632 (Tex. Crim. App. 2001); Ex parte
Menchaca, 854 S.W.2d 128, 131-33 (Tex. Crim. App. 1993). 
12. Strickland, 466 U.S. at 688.
13. Id. at 688, 690.
14. Thompson, 9 S.W.3d at 813 (citing Ingham v. State, 679 S.W.2d 503, 509 (Tex.
Crim. App. 1984)).
15. Ex parte Chandler, 182 S.W.3d at 354 (quoting Strickland, 466 U.S. at 694).
16. Strickland, 466 U.S. at 694.
17. Id. at 695; Ex parte Nailor, 149 S.W.3d at 130. 
18. Ex parte White, 160 S.W.3d 46, 50 (Tex. Crim. App. 2004).
19. Ex parte Brown, 158 S.W.3d 449, 453 (Tex. Crim. App. 2005).
20. See Ex parte Ewing, 570 S.W.2d 941, 944 (Tex. Crim. App. 1978) ("The fact that
another attorney may have pursued a different tactical course of trial is insufficient to
support a finding of ineffective assistance of counsel.") (citing Ewing v. State, 549 S.W.2d
392, 395 (Tex. Crim. App. 1977)).
21. Ellis, 2004 Tex. App. LEXIS 295, at *3-5. 
22. But see Robertson v. State, 187 S.W.3d 475, 484-86 (Tex. Crim. App. 2006). 
23. Gutierrez v. State, No. 13-00-438-CR, 2001 Tex. App. LEXIS 7972, at *10 (Tex.
App.--Corpus Christi Nov. 29, 2001, no pet.) (not designated for publication) ("A daring
tactic, although risky, is sometimes successful, and so does not vitiate either the
presumption of counsel's effectiveness or the deference in the assessment of strategy.").
24. Strickland, 466 U.S. at 694; see also Ex parte Adams, 768 S.W.2d 281, 287-88
(Tex. Crim. App. 1989) (stating that "the applicant assumes the burden of proving his
factual allegations by a preponderance of the evidence[.]") (citing Ex parte Adams, 707
S.W.2d 646, 648 (Tex. Crim. App. 1986); Ex parte Salinas, 660 S.W.2d 97, 101 (Tex.
Crim. App. 1983); Ex parte Griffin, 679 S.W.2d 15, 17 (Tex. Crim. App. 1984)).