# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-09-00382-CR
NO. 03-09-00383-CR

**Camilo Henriquez, Appellant**

**v.**

**The State of Texas, Appellee**

FROM THE COUNTY COURT AT LAW NO. 6 OF TRAVIS COUNTY
NOS. C-1-CR-08-202871 & C-1-CR-08-202897
HONORABLE JAN BRELAND, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Camilo Henriquez of the offenses of resisting arrest and interfering with public duties. *See* Tex. Penal Code Ann. § 38.03 (West 2003), § 38.15 (West Supp. 2009). Punishment was assessed at 180 days' confinement and a $2,000 fine, but the trial court suspended imposition of the sentence and placed Henriquez on community supervision for 24 months. In a single point of error, Henriquez asserts that he received ineffective assistance of counsel. We will affirm the judgments.

## BACKGROUND

The jury heard evidence that, at approximately 3:00 a.m. on February 15, 2008, Austin Police Department officers Patrick Martinez, Christina Oldham, and Kelly LaHood responded to a domestic-disturbance call at a residence in southeast Austin. Upon arrival at the residence,

they encountered a man sitting in the garage who was identified as Jose Hernandez. During trial, the officers described Hernandez as "a large subject," shirtless, and intoxicated. Upon further investigation, the officers ascertained, as Officer Oldham testified:

> Mr. Hernandez was having a fight with his child's mother. They had gone out that night, and something had occurred—whether it was somebody getting jealous about somebody else looking at another woman. There [were] two sides of a story. They had come back and argued and Mr. Hernandez started damaging the home, punching walls or putting holes in the wall and scratched up the . . . car outside in the driveway.

After talking to Hernandez's girlfriend, who, according to Oldham, "didn't have any pain, nor did she have any visible injuries," the officers decided that "there was no criminal offense." However, the officers ran a check on Hernandez and discovered that he had "two Class C local warrants." The officers then called their supervisor and received permission to arrest Hernandez on the warrants.

Before he was arrested, Hernandez started complaining of chest pains. The officers called for EMS, which arrived shortly thereafter. According to Oldham, "[EMS] hooked him up to an EKG, made sure he was okay." However, Oldham recalled, Hernandez "started not to cooperate with EMS. He didn't want to talk to them, didn't want to deal with them, and he signed away his waiver to not be treated by them."

Before EMS left the scene, a red pickup truck arrived at the residence. The driver of the truck was identified as Hernandez's stepfather, Henriquez. Oldham testified that she approached the truck and asked Henriquez to remain inside the vehicle. At first, Henriquez complied. However, according to Oldham, as the officers were placing Hernandez in the patrol car, Henriquez got out of the truck and walked toward the officers, asking them if he could speak with his son.

2

Officer LaHood testified that she denied the request and instructed Henriquez to return to his vehicle until they secured Hernandez. However, Henriquez "didn't move." LaHood explained,

> At that point, since he didn't move, he started kind of looking at me and started moving a little bit more forward, took a step towards his son and the other officers. So at that point, I shuffled to the side and basically stepped in his way and said 'No. I told you go back to your truck. Wait there.'

Henriquez did not comply. According to LaHood, "That is when he stepped off to the side and brushed against my shoulder and started ignoring me, saying 'I know the law. I want to ask my son a question.' He started going towards his son. That is when we decided to make the arrest."

LaHood testified that as she and Oldham attempted to arrest Henriquez, he "pulled away" from them. The officers grabbed Henriquez again, and he again resisted. During the ensuing struggle, the officers and Henriquez fell to the ground. The officers then called for backup. LaHood recalled, "We had a very difficult time handcuffing him and getting his arms behind his back."

As LaHood and Oldham were struggling to secure Henriquez on the ground, Officer Martinez was having difficulty securing Hernandez in the patrol car. Martinez testified that, once Hernandez saw his father on the ground, "he wouldn't budge," and began yelling and attempting to pull away from Martinez. At that point, Martinez "decided to push him up against the vehicle and remain there until additional units arrived."

Eventually, the officers secured both Hernandez and Henriquez. The officers each testified about how Henriquez's behavior significantly complicated the arrest of Hernandez, who had been complying with the officers before his father arrived. LaHood summarized the situation:

3

"Officer Martinez was struggling with his suspect and the dad was on the ground fighting us. We had family members pouring out of the house. That created an extremely hostile environment." She concluded, "If the father, Camilo, wasn't a part of that, then everything would have gone really smoothly."

After the police officers testified, the State rested and Henriquez moved for a directed verdict. The trial court denied the motion. The defense called no witnesses.

The jury found Henriquez guilty of committing the offenses of resisting arrest and interfering with public duties, and he was placed on community supervision. Subsequently, Henriquez filed a motion for new trial, asserting that he was denied effective assistance of counsel. Following a hearing, the trial court denied the motion. This appeal followed.

## STANDARD OF REVIEW

To prevail on a claim of ineffective assistance of counsel, a defendant must prove by a preponderance of the evidence that: (1) counsel's performance was deficient, i.e., that it fell below an objective standard of reasonableness; and (2) counsel's deficient performance prejudiced the defendant. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007); *Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986). Unless the defendant makes both showings, it cannot be said that his conviction is rendered unreliable by a breakdown in the adversarial process. *Strickland*, 466 U.S. at 687.

To establish deficient performance, a defendant must show that "counsel was not acting as 'a reasonably competent attorney,' and his advice was not 'within the range of competence demanded of attorneys in criminal cases.'" *Ex parte Chandler*, 182 S.W.3d 350, 354 (Tex. Crim.

4

App. 2005) (quoting *Strickland*, 466 U.S. at 687). He must overcome the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). He must also "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Ellis*, 233 S.W.3d at 330 (citing *Miniel v. State*, 831 S.W.2d 310, 323 (Tex. Crim. App. 1992)). In other words, the defendant must show that "no reasonable trial strategy could justify the trial counsel's conduct." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). "We determine the reasonableness of counsel's challenged conduct in context, and view it as of the time of counsel's conduct." *Id*. at 101.

To satisfy the second prong of the *Strickland* test, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

We review a trial court's denial of a motion for new trial for abuse of discretion. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). This includes motions for new trial based on claims of ineffective assistance of counsel. *State v. Gill*, 967 S.W.2d 540, 541 (Tex. App.—Austin 1998, pet. ref'd). Accordingly, in this case, we do not apply the aforementioned *Strickland* test de novo. *Id*. at 542. Rather, we review the trial court's application of the *Strickland* test under the abuse-of-discretion standard. *Id*. "We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable." *Charles*, 146 S.W.3d at 208. "We must view the evidence in the light most favorable to the

5

trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party." *Id*. "Thus, a trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling." *Id*.

## ANALYSIS

In his sole point of error, Henriquez claims that trial counsel was ineffective by (1) failing "to conduct an independent investigation" to "seek out known witnesses with potentially exculpatory testimony" and calling those witnesses to testify; (2) failing to call Henriquez and Hernandez to testify; and (3) defending Henriquez by "relying solely on inconsistencies in the three police officers' testimony."

Four witnesses testified at the hearing on the motion for new trial: Henriquez; Henry Curtis Woodcock, lead counsel for the defense; Nathaniel Williams, second chair; and Chris Parks, another attorney who worked for the law firm that represented Henriquez. Before discussing Hernriquez's claims, we will summarize the testimony of each of the witnesses during the new trial hearing.

During Henriquez's testimony, he was asked why he and his stepson did not testify during trial. According to Henriquez, after the officers testified and the State rested its case, Woodcock told him "that he had the case won; that I didn't have to testify or say anything because he had it wrapped up" and "in the bag." Henriquez also testified that Woodcock advised him not to testify, because if he did testify, "anything can go wrong." Henriquez also claimed that Woodcock told him that his son did not need to testify because "we are okay. We got it." Henriquez claimed

6

that he did not agree with Woodcock's decision not to call him and his son to testify and that he never told counsel that he agreed with the decision. He wanted the jury to hear "[his] story" about "what really was going on." Henriquez believed that his testimony would be materially different from the testimony of the officers (although he did not explain in what ways). However, Henriquez testified that after Woodcock conveyed that "he was pretty sure he had the case won," he told Woodcock, "Well, you know, you are the lawyer. You are the one that knows." Henriquez was also asked if he had "any other witnesses [other than he and his son] that could have testified and were ready to go at this trial." Henriquez testified, "No, it was just the two of us."

During Woodcock's testimony, he was first asked about a conversation he had with Hernandez prior to trial concerning Hernandez's recollection from the night of the arrest. According to Woodcock, Hernandez claimed that he saw and heard everything that occurred between the police and his father. However, Woodcock also testified that Hernandez told him that "he had a great deal to drink that night" and was "pretty intoxicated."

Woodcock was next asked if there were other witness present the night of the arrest who would have seen and heard what had occurred between the officers and Henriquez. Woodcock testified that there were not. He explained:

> There were the three officers and the two of them: Mr. Henriquez and Mr. Hernandez. Those are the only people at the time the officers took him down. At the time all the facts in dispute occurred, those [were] the only people there according to everyone I talked to.

Woodcock added that, based on his review of the police report, "there were other people there [at the residence]" that night who had observed Hernandez become intoxicated, but, according to Woodcock, "There was no one else there when the events in question occurred."

The following testimony was then elicited concerning counsel's trial strategy and the decision to not call Hernandez and Henriquez to testify:

Q:    Did you find Mr. Hernandez—did you consider him to be believable in what he was telling you?

A:    Not at all.  I considered him to be someone who was going to be very easy to cross-examine.  Someone who admittedly was extremely intoxicated and probably didn't have much memory of what was going on.  I found his story to be consistent with Mr. Henriquez, but I didn't think anyone was—well—

Q:    You didn't think the jury would find either of the two believable on the witness stand under oath?

A:    No.

Q:    So you proceeded to conduct the trial's first chair counsel for your client, knowing as you went into it that you weren't going to put either one of those witnesses on the stand.  Right?

A:    No.  That is not correct, sir.  The choice of whether or not a defendant should testify is exclusively the defendant's.

Q:    Did you decide not to have him testify because you—either witness—because you already concluded before the trial started that neither one would be believable?

A:    That was one of the factors in my recommendation to him not to testify.  Yes. There were others.

Q:    Okay.  As the trial developed and the three officers testified, significant inconsistencies in the three officers' testimony developed on the State's side of the case.  Yes?

8

A: Yes. I think, through my cross-examination, I was able to bring out significant inconsistencies.

Q: Did you conclude that the defendant and the other witness shouldn't testify to clear those up?

A: No, sir. I concluded that if they took the stand that I thought there would be a better chance for him if we would point out inconsistencies between the officers than if he took the stand and no one believed him and didn't like him and what he had to say or what his son had to say. I thought the chance was better just pointing out inconsistencies between the officers. If he took the stand, he only had something to lose, as far as I was concerned. But it was his choice.

Q: Your client did tell you he was ready, willing and able to testify in his own defense. Did he not?

A: He told me he was going to do what he thought I believed was the right thing to do—

Q: Okay.

A: —after I encouraged him and let him know it was his choice; he wasn't going to get another chance to testify; this was going to be it.

. . . .

Q: Whose decision was it not to put Jose Hernandez on the stand, who told you he could remember everything he saw and heard?

A: That was my decision.

Q: Did your client, Mr. Henriquez, tell you he wanted his stepson to testify because he was waiting outside the courtroom?

A: No. He did not. In fact, we discussed that when we were talking about whether he should testify or not. I told him I didn't think—if he wasn't going to testify, I didn't think his son should testify. If he was going to testify, I thought his son probably should testify. But if he wasn't going to, I thought it was better for his son not to testify either. So he agreed with that.

9

Q:      Just because a defendant doesn't testify and you advise a defendant not to testify, is there any reason why another material witness should not necessarily testify?

A:      I guess in an abstract world, no. But as far as the facts of this case are concerned, I felt that what he had to say would not be viewed as credible. It certainly wasn't necessary if his father wasn't going to testify.

Woodcock also testified that he was concerned about Henriquez getting on the stand and being impeached with his criminal record. Woodcock testified that Henriquez had a prior DWI conviction and an unspecified misdemeanor conviction, both from the 1980s. Although Woodcock acknowledged that Henriquez's prior convictions were "old" and thus generally inadmissible,[1] he believed that "there was a good likelihood" that Henriquez might "open the door" to these convictions through his answers to the prosecutor's questions during cross-examination.

Woodcock denied ever telling Henriquez that the case was "won," "in the bag," or "wrapped up." He added, "I would never tell any of my clients that in the context of a jury trial. There is no way you can know what a jury is going to do."

The testimony of Williams and Parks was largely consistent with Woodcock's testimony. Both Williams and Parks testified that they did not recall Woodcock ever telling Henriquez that the case was won. Both testified that Henriquez ultimately agreed with Woodcock's advice not to testify and not to have Hernandez testify. Both also testified that there were inconsistencies in the testimony of the police officers and that their trial strategy was to point out these inconsistencies during their cross-examination of the officers.

---

[1] *See* Tex. R. Evid. 609(b) (providing that evidence of prior conviction is generally inadmissible if "a period of more than ten years has elapsed since the date of the conviction").

10

We conclude that the record supports a finding by the trial court that Henriquez failed to satisfy either prong of the *Strickland* test. First, the trial court would not have abused its discretion in finding that Henriquez failed to prove that counsel's performance fell below an objective standard of reasonableness. Henriquez claims that counsel failed to "independently investigate" and "seek out" additional witnesses to the confrontation between the police and Henriquez on the night of the arrest. However, none of the witnesses at the hearing on the motion for new trial, including Henriquez, provided any testimony suggesting that counsel's investigation was somehow incomplete or that he failed to seek out potential witnesses to interview.

Moreover, the trial court would not have abused its discretion in finding that there were no other material witnesses for counsel to interview. Henriquez points to the trial testimony of Officer LaHood, who claimed that there were "a lot of people in the house, [and] outside the house" and that there were "family members pouring out of the house" during the arrest. However, Officer Martinez testified that these family members did not come out of the house until after Henriquez had already been taken to the ground by Oldham and LaHood and after Hernandez had already been pinned against the patrol vehicle by Martinez. The trial court could have reasonably inferred from this testimony that the family members—none of whom Henriquez identified at the hearing—did not observe the events prior to the arrest, including Henriquez committing the alleged offenses. Thus, the trial court could have found that any additional witnesses were not material to the case and, therefore, that counsel was not deficient in declining to interview them. Such a finding is supported by the testimony of both Henriquez and Woodcock at the hearing. When asked if he had "any other witnesses that we haven't discussed that could have testified and were ready to go

11

to trial," Henriquez testified, "No. It was just the two of us," referring to himself and his stepson. Then, when Woodcock was asked if there were other witnesses present the night of the arrest who would have seen and heard what had occurred between the officers and Henriquez, Woodcock testified,

> There were the three officers and the two of them: Mr. Henriquez and Mr. Hernandez. Those are the only people at the time the officers took him down. At the time all the facts in dispute occurred, those [were] the only people there according to everyone I talked to.

He acknowledged that there were other people at the house that night but, according to Woodcock, "There was no one else there when the events in question occurred." The trial court, as fact-finder at the hearing, would not have abused its discretion in crediting this testimony.

Henriquez next asserts that counsel was ineffective in advising him not to testify. A criminal defendant has a constitutional right to testify on his own behalf. *Rock v. Arkansas*, 483 U.S. 44, 51-52 (1987); *Smith v. State*, 286 S.W.3d 333, 338 n.9 (Tex. Crim. App. 2009). It is the responsibility of defense counsel to inform a defendant of his right to testify, including the fact that the ultimate decision of whether to testify belongs to him. *See Johnson v. State*, 169 S.W.3d 223, 235 (Tex. Crim. App. 2005). Therefore, a claim that counsel, through his advice or lack thereof, denied a defendant the right to testify is subject to a *Strickland* analysis.[2] *See id*.; *Agosto v. State*, 288 S.W.3d 113, 116 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

---

[2] It is unclear from Henriquez's brief whether he is arguing on appeal that he was denied his constitutional right to testify. However, that argument was raised at the hearing on the motion for new trial, and thus we will address it. *See* Tex. R. App. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included.").

In this case, the record supports a finding by the trial court that counsel did not deny Henriquez the right to testify. Although Henriquez claimed that he never told Woodcock that he agreed with the decision not to testify, the trial court would not have abused its discretion in concluding otherwise. According to Woodcock, Henriquez "told me he was going to do what he thought I believed was the right thing to do—after I encouraged him and let him know that it was his choice; he wasn't going to get another chance to testify; this was going to be it." According to Williams, Henriquez "may have expressed a certain interest in testifying," but he did not recall Henriquez "being adamant and insisting that he testify." Williams did recall "in the end [Henriquez] putting his trust in our judgment." Parks similarly testified that "at the end of the day, it was Mr. Henriquez's decision" not to testify. Parks also testified as follows:

Q: Do you recall Mr. Henriquez being upset that he wasn't going to be allowed to testify?

A: Mr. Henriquez said, 'You are the attorney. I am going to go with what you suggest.' But he decided that if Mr. Woodcock felt that [was] where the trial was at, that it wouldn't be beneficial to his case, he would go with what Mr. Woodcock had to say.

Q: Is it fair to say that originally Mr. Henriquez had expressed some interest in testifying, but ultimately left the decision up to his lawyers?

A: Right. I think Mr. Henriquez, based on my understanding of the situation, did want his story to be told. He had discussed with Mr. Woodcock potentially either he testifying or his son testifying. But after Mr. Woodcock and Nathaniel highlighted how that testimony had gone and how it might not be beneficial to Mr. Henriquez's case, he agreed and decided he was choosing not to testify.

13

The trial court could have reasonably found from this and other evidence that Henriquez had knowingly and voluntarily chosen not to testify and, therefore, that counsel had not denied him the right to testify. To the extent that Henriquez may be arguing that he was misled by counsel into not testifying because counsel convinced him that he had the case "won," "wrapped up," or "in the bag," we observe that all three attorneys denied that Woodcock ever made such statements. The trial court was free to disbelieve Henriquez's testimony to the contrary.

As for the merits of counsel's advice to Henriquez not to testify, it is well settled that the decision whether to put a defendant on the stand is a "judgment call" that should not easily be condemned with the benefit of hindsight. *See United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002); *Robison v. Johnson*, 151 F.3d 256, 262 (5th Cir. 1998); *United States v. Garcia*, 762 F.2d 1222, 1226 (5th Cir. 1985); *Hollenbeck v. Estelle*, 672 F.2d 451, 454 (5th Cir. 1982). Here, Woodcock testified that he advised Henriquez against testifying because he believed Henriquez would not be a credible witness and because he believed it would be safer for counsel to point out the inconsistencies in the officers' testimony during cross-examination rather than to have Henriquez testify to his version of events. As Woodcock put it, "If he took the stand, he only had something to lose, as far as I was concerned." The trial court would not have abused its discretion in deferring to counsel's assessment of the situation. If Henriquez had testified, it would have been his word against the testimony of three police officers. Counsel could have reasonably concluded that whatever minimal benefit Henriquez may have gained from testifying was outweighed by the risk of a damaging cross-examination by the State. Additionally, it is undisputed that Henriquez had prior convictions. As Woodcock correctly observed, although these convictions were generally

14

inadmissible under rule 609(b), it would have been possible for Henriquez to open the door to their admission through his testimony. *See Grant v. State*, 247 S.W.3d 360, 366-67 (Tex. App.—Austin 2008, pet. ref'd) ("Where the witness creates a false impression of law-abiding behavior, he 'opens the door' on his otherwise irrelevant past criminal history and opposing counsel may expose the falsehood."). Also, even if Henriquez had not opened the door, the convictions conceivably might have been admitted if the trial court had concluded that the probative value of the convictions substantially outweighed their prejudicial effect. *See* Tex. R. Evid. 609(b). Given these risks, the trial court could have found that it was reasonable for counsel to conclude that testifying would do his client more harm than good. *See Lucious v. State*, 828 S.W.2d 118, 123 (Tex. App.—Houston [14th Dist.] 1992, no pet.) ("In light of appellant's prior criminal record, advice that appellant not testify was certainly plausible trial strategy.")

Henriquez further complains about counsel's decision not to have Hernandez testify. However, the decision to call a witness is generally a matter of trial strategy. *Rodd v. State*, 886 S.W.2d 381, 384 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd). Matters of trial strategy will be considered deficient only if an attorney's actions are without any plausible basis. *See Simms v. State*, 848 S.W.2d 754, 757 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd). Here, the record supports a finding by the trial court that there was a plausible basis for counsel's decision not to have Hernandez testify. Woodcock testified that Hernandez told him that "he had a great deal to drink that night" and was "pretty intoxicated" at the time of the incident. As Woodcock explained, "I considered him to be someone who was going to be very easy to cross-examine. Someone who admittedly was extremely intoxicated and probably didn't have much memory of what was

going on." Although Woodcock acknowledged that Hernandez had told him that he had heard and seen everything that night, Woodcock could have reasonably concluded that, given Hernandez's admitted intoxication, the jury would not have found Hernandez's account of the incident credible. Additionally, it was Hernandez's alleged violent behavior toward his child's mother on the night in question that led to the officers being on the scene in the first place. Also, it must be remembered that Hernandez was Henriquez's stepson, which could have made Hernandez appear biased. Thus, counsel could have reasonably concluded that Hernandez would not have been a credible witness. *See Damian v. State*, 881 S.W.2d 102, 110 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd) ("[W]hen in counsel's reasonable judgment, a possible witness is as potentially dangerous as he or she might be helpful, it is not ineffective assistance to not call the witness to the stand.").

Finally, Henriquez complains about counsel's trial strategy in seeking to undermine the credibility of the police officers through cross-examination. The trial court would not have abused its discretion in finding that this strategy did not fall below an objective standard of reasonableness. The record reflects that there were inconsistencies in the testimony of the officers that counsel brought out through extensive and thorough cross-examination of the officers. For example, LaHood testified that Henriquez had "brushed past" her shoulder in an attempt to reach his son, implying that Henriquez was disobeying her and had made physical contact with her prior to the arrest. Oldham, however, who claimed to have observed the events leading up to the arrest, testified on cross that she "did not see [Henriquez] move past [LaHood]." Also, Oldham testified that she spoke with Henriquez when he first arrived at the scene. However, LaHood testified on cross that she did not "recall that at all." Moreover, counsel got Martinez to admit that his back was

16

turned when the altercation between Henriquez and the other officers began and that, because his attention was focused on securing Hernandez, he did not observe most of the incident. The trial court could have concluded that pointing out these and other problems with the officers' testimony was a reasonable trial strategy designed to cast doubt on the officers' recollection of the events preceding the arrest. That this strategy did not succeed in acquitting Henriquez of the charges against him does not mean that the strategy was deficient. *See Ex parte Ewing*, 570 S.W.2d 941, 944 (Tex. Crim. App. 1978) ("The fact that another attorney may have pursued a different tactical course of trial is insufficient to support a finding of ineffective assistance of counsel."). For these and other reasons, the trial court would not have abused its discretion in finding that Henriquez failed to prove that counsel's performance was deficient.

Nor would the district court have abused its discretion in finding that Henriquez failed to prove that counsel's performance, even if deficient, prejudiced him. Although Henriquez testified that his version of the incident would have been different from the arresting officers, he did not explain how it would have been different, or how such differences would have strengthened his case. Hernandez did not testify during the hearing, nor did any of the "additional witnesses" who Henriquez claimed had observed the incident. Thus, there was no way for the trial court to determine whether there was a reasonable probability that the result of the proceeding would have been different had counsel called these witnesses to testify. *See Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex. Crim. App. 1986) ("Absent a showing that potential defense witnesses were available, and that their testimony would benefit the defense, counsel's failure to call witnesses is of no moment."); *Parmer v. State*, 38 S.W.3d 661, 668 (Tex. App.—Austin 2000, pet. ref'd) ("Counsel's failure to

17

call witnesses at the guilt/innocence stage of a trial is irrelevant to a claim of ineffective assistance of counsel absent a showing that the witnesses were available and the defendant would have benefitted from the presentation of their testimony."). Also, the trial court could have found that Henriquez failed to show how there is a reasonable probability that the result of the proceeding would have been different if counsel had employed a trial strategy other than that of undermining the credibility of the police officers.

On the above record, we cannot conclude that the trial court abused its discretion in finding that Henriquez did not prove by a preponderance of the evidence that he was denied effective assistance of counsel. Accordingly, we cannot conclude that the trial court abused its discretion in denying Henriquez's motion for new trial.

We overrule Henriquez's sole point of error.

### CONCLUSION

We affirm the judgments of the trial court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed

Filed: March 10, 2010

Do Not Publish

18