NOS. 07-08-0233-CR, 07-08-0234-CR, 07-08-0235-CR,
07-08-0236-CR, 07-08-0237-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A
Â 
NOVEMBER 24, 2009
______________________________

JOSEPH WENDELL HUME, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_________________________________

FROM THE 181ST DISTRICT COURT OF RANDALL COUNTY;

NO. 19,597-B, 19,600-B, 19,601-B, 19,611-B, 19,619-B;

 HONORABLE JOHN BOARD, JUDGE
_______________________________


Before CAMPBELL and HANCOCK and PIRTLE, JJ.
MEMORANDUM OPINION
Â Â Â Â Â Â Â Â Â Â Appellant, Joseph Wendell Hume, appeals his consecutive life sentences for eight
offenses. We affirm.
Background 
Â Â Â Â Â Â Â Â Â Â On January 6, 2008, Lenora Braddock was shopping at Kohlâs in Amarillo, Texas,
with her two daughters. As the three women returned and entered their vehicle, appellant
entered into the back seat of the vehicle. Appellant pulled a gun and robbed the three
women. Later on that same day, appellant approached another woman in a Walmart
parking lot and displayed a gun. Appellant had the woman drive him out of the parking
lot to a secluded area where he proceeded to rob and rape her. During the second
assault, appellant asked the victim to put on lipstick, place a cigarette in her mouth to wet
it, and to then give him the cigarette. Because of appellantâs unusual request for a wet
cigarette with lipstick, the police took a second look at a 2006 case in which two women
were robbed at the Westgate mall parking lot. In that Westgate mall case, the robber also
asked the women to provide him a wet cigarette with lipstick. Appellant was charged with
six indictments, two of which contained multiple counts.
Â Â Â Â Â Â Â Â Â Â On May 22, 2008, appellant pled guilty to two counts of aggravated sexual assault
resulting from the Walmart incident and requested that the judge assess punishment. After
hearing punishment evidence from the victims in all three incidents, the trial judge
sentenced appellant to life imprisonment in the Institutional Division of the Texas
Department of Criminal Justice (ID-TDCJ), each sentence to be served concurrently. After
a break in the proceedings, appellant then pled guilty to four additional indictments with the
State dismissing one indictment. Those four indictments included five charges of
aggravated robbery and one additional charge of aggravated sexual assault. In separate
proceedings, the trial court proceeded to sentence appellant in each of those four
indictments to life imprisonment in ID-TDCJ, the sentence for each indictment to be served
consecutively.


 
Â Â Â Â Â Â Â Â Â Â On May 29, appellant filed notice of appeal and, on June 20, filed a motion for new
trial. In his motion for new trial, appellant contends that his trial counsel did not heed his
request for psychiatric help. At a hearing held on July 31 in regard to his motion for new
trial, appellant raised the issues of competency to stand trial as well as voluntariness of the
plea due to his lack of understanding of his eligibility for probation from a jury. At the
conclusion of the hearing on the motion for new trial, the trial court denied appellantâs
motion for a new trial. Appellant now appeals.
Â Â Â Â Â Â Â Â Â Â On appeal, appellant contends that (1) the trial court erred in denying his motion for
new trial because the plea was involuntarily entered by appellant who did not understand
probation eligibility nor the possibility of concurrent sentences from a jury; (2) the plea was
involuntarily entered by appellant who did not understand probation eligibility nor the
possibility of concurrent sentences from a jury; and (3) ineffective assistance of counsel. 
We affirm.
Denial of motion for new trial
Â Â Â Â Â Â Â Â Â Â To preserve an issue for appellate review, an appellant must make a timely and
specific objection at trial, and obtain a ruling from the trial court. See Tex.R.App.P. 33.1. 
When a defendant has no opportunity to object to a trial court's action until after it takes
place, a defendant may still preserve error by raising the objection in a timely filed motion
for new trial. See Issa v. State, 826 S.W.2d 159, 160-61 (Tex. Crim. App. 1992). The
granting or denying of a motion for new trial is within the discretion of the trial court. See
State v. Gonzalez, 855 S.W.2d 692, 696 (Tex.Crim.App.1993). A trial court abuses its
discretion when its action or decision is not within the zone of reasonable disagreement. 
See Montgomery v. State, 810 S.W.2d 372, 391(Tex.Crim.App.1991) (op. on rehâg). A trial
judge's ruling is presumed to be correct. See Lee v. State, 167 Tex.Crim. 608, 322 S.W.2d
260, 262 (1958). Implicit within the standard of review lies an element of deference to the
determinations of the trial court. See Santacruz v. State, 963 S.W.2d 194, 196 (Tex.App.â
Amarillo 1998, pet. refâd). When material issues of fact are raised by conflicting evidence
at a hearing on a motion for new trial, the trial court does not abuse its discretion in
overruling the motion. See Keady v. State, 687 S.W.2d 757, 759 (Tex.Crim.App. 1985). 
Â Â Â Â Â Â Â Â Â Â Initially, we note that appellant did not raise the issue of concurrent/consecutive
sentencing either during sentencing nor at the hearing on the motion for new trial. 
Therefore, appellant has waived this issue. Tex. R. App. P. 33.1. On the issue of whether
trial counsel adequately explained the possibility of probation from a jury, we find that the
testimony of trial counsel during the hearing on the motion for new trial is sufficient to
support the trial courtâs ruling. Appellant contends that trial counsel never raised the
possibility of probation from the jury. However, upon recall, trial counsel explained that,
because the State intended to proceed forward to trial on each indictment, her opinion was
that a jury was not likely to recommend probation in five separate trials. Even if trial
counselâs testimony raised, at best, a conflict in evidence as to whether trial counsel
conveyed the information to appellant that probation was an option with a jury, the trial
court did not abuse its discretion in overruling the motion. See Keady, 687 S.W.2d at 759.
We defer to the determinations of the trial court. See Santacruz, 963 S.W.2d at 196. We
overrule appellantâs first issue.
Voluntariness of plea
Â Â Â Â Â Â Â Â Â Â When considering the voluntariness of a guilty plea, we must examine the entire
record. See Martinez v. State, 981 S.W.2d 195, 197 (Tex. Crim. App. 1998) (per curiam). 
A finding that a defendant was duly admonished creates a prima facie showing that a guilty
plea was entered knowingly and voluntarily. Id. at 197. A defendant may still raise the
claim that his plea was not voluntary; however, the burden shifts to the defendant to
demonstrate that he did not fully understand the consequences of his plea such that he
suffered harm. Id.
Â Â Â Â Â Â Â Â Â Â On appeal, appellant contends that his pleas were involuntary because he did not
believe he was eligible for probation from a jury and further believed that sentencing from
a jury meant automatic consecutive sentencing. However, the clerkâs record in each of
these cases contains a felony plea memorandum containing appellantâs signature
documenting that appellant was indeed admonished accordingly. See Tex. Code Crim.
Proc. Ann. art. 26.13 (Vernon Supp. 2009).


 Since the felony plea memorandum creates
a prima facie showing of voluntariness, see Martinez, 981 S.W.2d at 197, the burden is
upon appellant to demonstrate he did not fully understand the consequences of his plea. 
Again, the issue of consecutive sentences was not raised during the hearing on the motion
for new trial nor at the original plea. Hence, the record before us contains no evidence of
appellantâs alleged misunderstanding regarding consecutive sentencing. We conclude that
appellant has not met his burden and that the record does not support appellantâs
contention that his attorney led him to believe that jury sentencing meant automatic
consecutive sentencing. Â 
Â Â Â Â Â Â Â Â Â Â Next, appellant contends that he believed that a jury could not give him probation
and that his only option for receiving probation was to go to the trial judge for punishment. 
From the testimony during the hearing on the motion for new trial, trial counsel initially
stated that âI had also already provided him with copies of the statutes that showed he
wasnât eligible for probation.â However, when asked to clarify her statement, trial counsel
stated

If we went to successive trials â once he had one trial doesnât mean heâs
going to get probation on the other trials, or that you would be able to give
him probation. Probation is always a possibility. I repeatedly told him that
I did not feel like a jury trial in Randall County would give him probation on
any case that was tried. I had prepared applications [for probation] to
provide him. . . . it was just that once we tried one, even if he had gotten
probation on one of them, it doesnât mean if we went to trial on the next one
â and my understanding from the district attorneyâs office was that they
would do a jury trial on each one of the offenses. So itâs not that he wouldnât
have necessarily been eligible, but that I didnât feel that a jury would give him
probation, that if we did one it doesnât mean he would get it on all the others.

Â 
When directly asked if appellant knew that there was that slight chance that he could get
probation from a jury, trial counsel answered, âI am â I â yes.â Further on cross
examination, trial counsel was asked, âDid you tell him he was not eligible for probation
from a jury,â trial counsel answered, âNo.â During that same hearing, appellant testified
and stated, âI asked her [trial counsel] what would be the best solution if possible, and she
said the judge would probably be the best solution, because the jury would stack the
charges and all â probably would not give you probation.â However, when asked later, âDid
you ever, at any time, think that a jury could give you probation in these cases,â appellant
answered, âNo.â
Â Â Â Â Â Â Â Â Â Â In addition to the testimony offered at the hearing on the motion for new trial, we
also have a transcript from a meeting between appellant, trial counsel and the district
attorney. In an unusual step, and against trial counselâs advice, appellant demanded and
received a meeting with the district attorney and an assistant district attorney. At the
meeting, the State reiterated its offer to appellant that, in exchange for a plea of guilty, that
the State would recommend life sentences but would ask that the sentences not be
stacked. At that meeting, several terms related to probation were used including stacked,
concurrent, and deferred adjudication. Finally, we have the clerkâs record of the plea
hearing where it appears that appellant received properly administered admonishments. 
Â Â Â Â Â Â Â Â Â Â From an examination of the entire record, it would appear that the only evidence
supporting appellantâs contention is his self-serving statement at the hearing on the motion
for a new trial. Appellant was aware of, at minimum, the possibility of probation. 
Considering that appellant was insistent that he be given probation, trial counsel would
have investigated the different possibilities of gaining probation for her client. In support
of that proposition, we have trial counselâs statement that she had never told him that he
couldnât get probation from a jury, but only that there was a slight chance. We also have
appellantâs statement that trial counsel told him that a jury âprobably would not give you
probation.â We also have a transcript of a meeting requested by appellant where probation
is the main topic of discussion. Throughout the meeting, appellant and the attorneys
discuss several options such as jury trials, plea bargains, and an open plea before the
judge. Eventually, appellant decides on an open plea because of the understanding that
the judge could give him deferred adjudication. At that plea, appellant signed a felony plea
memorandum containing the admonishment according to art. 26.13 as well as received the
same admonishments from the trial judge verbally. Considering the prima facie showing
that a guilty plea was entered knowingly and voluntarily, we conclude that appellant has
not met his burden to demonstrate that his plea was involuntarily entered because he
believed that a jury could not give him probation. We overrule appellantâs second issue.
Ineffective assistance of counsel
Â Â Â Â Â Â Â Â Â Â The right to counsel affords an accused an attorney reasonably likely to render and
rendering reasonably effective assistance. See Stafford v. State, 813 S.W.2d 503, 506
(Tex. Crim. App. 1991). In analyzing claims of ineffective assistance of counsel, we apply
the two-part test announced in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052,
80 L. Ed. 2d 674 (1984). Ex parte Ellis, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007).
Under this framework, appellant must prove by a preponderance of the evidence that: (1)
his counsel's performance was deficient; and (2) there is a reasonable probabilityâone
sufficient to undermine confidence in the resultâthat the outcome would have been
different but for his counsel's deficient performance. Id.
Â Â Â Â Â Â Â Â Â Â To establish deficient performance, appellant must show that counsel was not acting
as a reasonably competent attorney, and his advice was not within the range of
competence demanded of attorneys in criminal cases. Id. Appellant must overcome the
strong presumption that counsel's conduct fell within the wide range of reasonable
professional assistance. Id. Therefore, appellant must overcome the presumption that,
under the circumstances, the challenged action might be considered sound trial strategy.
Id. The reasonableness of an attorney's performance is judged according to the prevailing
professional norms and includes an examination of all the facts and circumstances
involved in a case. Id. We must be highly deferential to trial counsel and avoid the
deleterious effects of hindsight. Id.
Â Â Â Â Â Â Â Â Â Â Under the second prong of the Strickland analysis, appellant must establish that the
constitutionally deficient performance prejudiced his defense--that is, he must show that
there is a reasonable probability that, but for counsel's unprofessional errors, the result of
the proceeding would have been different. Id. A reasonable probability is a probability
sufficient to undermine confidence in the outcome. Id. at 330-31. When making this
determination, any constitutionally deficient acts or omissions will be considered in light of
the totality of the evidence before the judge or jury. Id. at 331.
Â Â Â Â Â Â Â Â Â Â Under the first prong, it appears that trial counsel has performed according to the
professional norms. Since appellant was facing 3g offenses, see art. 42.12 Â§ 3g, appellant
was not eligible for judge ordered community supervision after conviction or a plea of guilty. 
 Thus, appellantâs only options were to receive probation from a jury at the conclusion of
five jury trials, or to receive deferred adjudications from the trial judge. See art. 42.12 Â§ 4,
5. Although testimony at the hearing on the motion for new trial was confusing at times,
it is apparent that appellantâs trial counsel was discounting the possibility of appellant
receiving probation from a jury multiple times, not that probation was not available from a
jury. Additionally, appellant and his counsel had met with the district attorney and an
assistant district attorney to discuss a probation offer prior to the date appellant pled guilty. 
At that time, appellantâs trial counsel explained that, if appellant went to the trial judge for
sentencing, the judge was bound within the punishment range for the offenses as set out
by the legislature. However, within that range, trial counsel explained that the judge would
have the ability and discretion to sentence appellant to anything within that range. Also,
at that time, the issue of concurrent sentences came up only briefly. The mention of
concurrent sentences was when the district attorney reiterated the offer previously given
to appellant, that being six life sentences to run concurrently. Given the fact that appellant
was facing six indictments and that the State has declared its intention to prosecute each
before a jury unless appellant pled guilty, appellant has not overcome the strong
presumption that counsel's conduct fell within the wide range of reasonable professional
assistance. Ex parte Ellis, 233 S.W.3d at 330. Because appellant has failed to establish
deficient performance by counsel, we will forego any analysis under the second prong of
Strickland. Tex. R. App. P. 47.1. We overrule appellantâs last issue. 
Conclusion
Â Â Â Â Â Â Â Â Â Â For the foregoing reasons, we affirm. Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Mackey K. Hancock

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice

Do not publish.



   Appellee

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  ___________________________

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  FROM
THE 99TH DISTRICT COURT OF LUBBOCK COUNTY;

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  NO.
2009-550,359; HON. WILLIAM SOWDER, PRESIDING

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  _______________________________

Opinion

_______________________________

Before QUINN,
C.J., and CAMPBELL and PIRTLE, JJ.

All political power is inherent
in the people, and all free governments are founded on their authority, and
instituted for their benefit.Â  The faith
of the people of Texas stands pledged to the preservation of a republican form
of government, and, subject to this limitation only, they have at all times the
inalienable right to alter, reform or abolish their government in such manner
as they may think expedient. [1]

Â Â Â Â Â Â Â Â Â Â Â  The issues before us today implicate
the above quoted section of our state constitution.Â Â  We have been asked to determine whether the
common law doctrine of sovereign immunity barred the suit of Mike Leach against
Texas Tech University (the University), its Chancellor Kent Hance, its regents
Jerry Turner and Larry Anders, its president Guy Bailey, its athletic director
Gerald Myers, and its employee/attorney Charlotte Bingham.Â  Applying the doctrine via a plea to the
courtÂs jurisdiction, the trial court dismissed all but one cause of action
averred by Leach.Â  The one remaining
encompassed the allegation of breached contract.Â  The trial court refused to dismiss it because
the University Âby and through its conduct . . . waived [its] immunity from
suit Â.ÂÂ 
We affirm in part, reverse in part, and render in part the trial courtÂs
order.

Standard of Review

Â Â Â Â Â Â Â Â Â Â Â  Who did what to whom and why is not something this court will decide.Â  Nor do we address the veracity of any of the
many accusations levied by the parties against each other and third
parties.Â  That is not within our authority
when addressing whether a trial court acted properly in granting a plea to its
jurisdiction.Â  This is so because such a
plea focuses upon the trial courtÂs authority to eventually adjudicate the
dispute on its merits; it is not itself an adjudication on the merits.Â  

Â Â Â Â Â Â Â Â Â Â Â  Next, a plea to the trial courtÂs
jurisdiction likens to a motion for summary judgment.Â  Tex.
DepÂt of Parks & Wildlife v. Miranda,
133 S.W.3d 217, 228 (Tex. 2004).Â  So, the jurist considering it is obligated to
1) interpret the pleadings in a light most favorable to the party attempting to
sustain the courtÂs jurisdiction, i.e. Leach, 2) accept as true all evidence
favorable to that party, and 3) indulge in every reasonable inference arising
from the evidence and favorable to him.Â  Id.; accord City of Elsa v. Gonzalez, 325 S.W.3d 622, __ (Tex. 2010).Â Â Â Â  

A Simplistic Review of History

Â Â Â Â Â Â Â Â Â Â Â  Given the nature of the issues at
bar, it is helpful to delve into the history underlying the doctrine of
sovereign immunity.Â  The latter found its
genesis in old England.Â  Then, as most
will admit, the king (or queen as the case may be) was omnipotent.Â  No inherent authority belonged to those over
whom he lorded.Â  Kemper
v. State, 138 S.W. 1025, 1043 (Tex. Crim App.
1911), overruled
on other grounds by Robertson v. State, 142
S.W. 533 (Tex. Crim. App. 1911).Â  Rather,
any rights or privileges they enjoyed were no greater than those the monarch
deigned to bestow on them.Â  Moreover, the
judiciary that he created not only recognized this relationship between the
king and his people but also deduced from it that since the former was
sovereign over all, the latter could not be sue him without his approval.Â  Thus, the tenet was of neither legislative
nor executive origin.Â  Instead, judges
simply declared it to be law.[2]Â  Tex. A&M
University-Kingsville v. Lawson,
87 S.W.3d 518, 520 (Tex. 2002) (stating that Âthe bar of sovereign immunity is
a creature of the common law and not of any legislative enactmentÂ).Â  

Â Â Â Â Â Â Â Â Â Â Â  With the discovery and population of
the New World, our forefathers were called upon to establish their own system
of government.Â  Having rebelled against
the tyranny of British rule, one would think that they would instill a
government of limited powers.Â  Indeed,
the constitutional passage written above purports to encapsulate that
sentiment.Â Â  Nonetheless, not all things
British were rejected for our own courts adopted much of the common law
developed overseas.Â  And,
included in that body of law was the doctrine of sovereign immunity.Â  See Harris County Hosp.
Dist. v. Tomball Regional Hosp., 283
S.W.3d 838, 844 (Tex. 2009) (recognizing sovereign immunity as part of the
common law).Â  So, though we have no king
and despite the words of article 1, Â§2 of our Texas Constitution, the
government (e.g.,
State, county, and municipalities) and those working for it in their official capacities
came to enjoy that created to protect monarchs so many years ago.[3]Â Â  

The Law of Sovereign Immunity

Â Â Â Â Â Â Â Â Â Â Â  We wish not to mislead.Â  It is clear that sovereign immunity is alive
and well in Texas.Â  As it now exists, it
provides a double shield to the entities it protects.Â  They are insulated from both liability and
suit.Â  Tex. A&M University-Kingsville v. Lawson, 87 S.W.3d at
520-21; Federal Sign v. Texas S. Univ., 951 S.W.2d 401, 405 (Tex. 1997).Â 
That is, one can neither sue for payment nor compel payment from the
State without legislative consent.Â  Federal
Sign v. Texas S. Univ., 951 S.W.2d at 405.Â 
Given this double shield, defeating one still meant the other
stood.Â  Take, for instance, the subject
of contracts.Â  In Texas, when the State
executes such an obligation it loses its immunity from liability.Â  Id. at 405-06.Â 
Yet, it remains protected from being forced into litigation via
suit.Â  Id.Â 
So, while it must perform and, like any other party to a contract, is
responsible for its failure to do so, it cannot be sued for damages without its
permission if it opts to forego performance.Â 
In other situations, the converse is also true; the State may grantÂ  someone
permission to sue it but retain its insulation from being forced to pay. Â Id.;
Ben
Bolt-Palito Blanco Consol. Indep. Sch. Dist.
v.
Tex. Political Subdivision Prop./Cas. Joint
Self-Insurance Fund, 212
S.W.3d 320, 323-24 (Tex. 2006) (explaining the nature of the immunity).Â  The logic behind that circumstance is not
ours to debate for that is the law as declared by our Supreme Court.

Â Â Â Â Â Â Â Â Â Â Â  That sovereign immunity extends to
state universities is similarly clear.Â  Ben
Bolt- Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Political Subdivision
Prop./Cas. Ins. Joint Self-Insurance Fund, 212 S.W.3d at 324.Â  Of less clarity, however, is the manner by
which a university or the State, for that matter, waives immunity.Â Â  

Â Â Â Â Â Â Â Â Â Â Â  Admittedly, our Supreme Court has
declared that it has Âconsistently deferred to the LegislatureÂ to effectuate
waiver.Â  Id. at 326, quoting Tex.
Natural Res. CommÂnÂ  v.
IT-Davy, 74 S.W.3d 849, 854 (Tex. 2002).Â  That is, we have been told that only the
legislature can remove the insulation.Â  Id.Â 
This purportedly is so because that body Âis better suited . . . to
weigh conflicting public policies associated with waiving immunity and
subjecting the government to increased liability, the burden of which the
public must bear.ÂÂ  Id.Â 
Moreover, the legislature accepted the onus of determining when to lower
the shield, as exemplified by statutes such as the Texas Tort Claims Act, Tex. Civ. Prac. & Rem. Code Ann.
Â§101.021 (Vernon 2005) (stating when governmental entities may be sued for
torts committed by their employees).Â 
Legislative writings with that effect, though, tend to be the exception,
not the rule.Â  And, that the legislature
intends to keep waiver as the exception is borne out by Â§311.034 of the Texas
Government Code.Â  Via the provision, our
representatives declared that Âa statute shall not be construed as a waiverÂ unless the waiver is effected by clear and unambiguous language.ÂÂ  Tex. GovÂt Code Ann.
Â§311.034 (Vernon Supp. 2010).Â  What this means, then, is that unless the
words of a statute controlling a particular dispute between the government and
its wards clearly and unambiguously specify that one or both aspects of
immunity are removed, the governmental entity continues to enjoy its judicially
created insulation against paying damages.Â 
See City of El Paso v.
Heinrich, 284 S.W.3d 366,
368-69 (Tex. 2009) (holding that sovereign immunity protects an entity from
suit for monetary, as opposed to equitable, relief).

Â Â Â Â Â Â Â Â Â Â Â  Reading Â§311.034 of the Government
Code and our Supreme CourtÂs utterances about deferring to the legislature
would seem to belie our prior observation that the manner of waiving immunity
falls short of clear.Â Â  But, they do not;
instances continue to arise supporting our observation.Â  For example, in Tex.
A&M University-Kingsville v. Lawson,
the Supreme Court had before it a factual scenario involving the universityÂs
refusal to abide by a settlement agreement.Â 
The latter encompassed the resolution of a whistleblower claim.Â  And, though the legislature waived its
immunity from suits founded upon such claims per Â§554.0035 of the Texas
Government Code, Tex. A&M University-Kingsville v.
Lawson, 87 S.W.3d at 521 (so stating), it
said nothing about the waiver encompassing agreements settling those
suits.Â  Id. Â Neither that omission nor the prior comments
about deferring to the legislature dissuaded a majority of the Texas Supreme
Court, though, from concluding that Lawson was not barred by sovereign immunity
from suing Texas A&M for breaching the
settlement.Â  Id. at 522-24.Â 


Â Â Â Â Â Â Â Â Â Â Â  Another
opinion of the Supreme Court also tending to muddy the waters is Federal
Sign v. Texas Southern University.Â  There, a majority of justices first said that
the decision to abrogate immunity lay with the Â. . .
Legislature's sole province . . . . ÂÂ  Federal
Sign v. Texas S. Univ., 951
S.W.2d at 409.Â Â  Then, that same majority
wrote:

We
hasten to observe that neither this case nor the ones on which it relies should
be read too broadly.Â  We do not attempt
to decide this issue in anyÂ 
other circumstances other than the one before us today.Â  There may be other circumstances where the
State may waive its immunity by conduct other than simply executing a contract
so that it is not always immune from suit when it contracts. 

Id. at 408 n.1.Â  Justice Hecht echoed that cautionary
statement in a concurring opinion.Â 
Joined by Chief Justice Phillips and Justices Cornyn and Owen, he said
that Â[c]ategorical statements in the Court's opinion must be read in this
context.ÂÂ  Id.
at 413.Â 
He then mentioned various ÂhypotheticalsÂ wherein Â. . .Â  the State may waive immunity by conduct . . .
so that it is not always immune from contract suits.ÂÂ  Id.Â 
Such observations hardly comport with the idea that only the legislature
can decide when, where, and how to waive sovereign immunity.

Â Â Â Â Â Â Â Â Â Â Â  In reading Federal
Sign, Texas A&M, and Â§311.034 of the Government Code,
we are left feeling somewhat like a dog chasing quarry that only runs in
circles.Â  We strive to reach the
designated end only to find ourselves back at the beginning.Â  Nevertheless, from the foregoing precedent
generalities can be garnered.Â  If one
invokes a statute as basis for defeating immunity, that statute must clearly
and unambiguously abrogate the shield.Â  Tex. GovÂt CodeÂ  Ann. Â§311.034 (Vernon Supp.
2010).Â  On the other hand, if the
purported waiver is founded upon non-statutory grounds, then we must search
precedent to determine whether the factual situation has already been addressed
by the Supreme Court.Â  E.g., Federal Sign v. Texas S.
Univ., supra (wherein the court clearly held that
executing a contract waives immunity from liability).Â  If that court has not, then we defer to the
legislatureÂs general authority to act on the matter, except when the
circumstances compel the judiciary to intervene, if ever.Â Â  With that said, we turn to the issues posed
to us by the parties.

Application of Sovereign Immunity
Â
Leach
Issues

A.Â Â Â 
Waiver by Operating
ProcedureÂ Â Â Â Â Â Â Â Â  

Â Â Â Â Â Â Â Â Â Â Â  We
first address LeachÂs argument that the UniversityÂs immunity was waived by
statute.Â  The statute in question is
Â§109.001(c) of the Texas Education Code.Â 
Through it, the legislature wrote:

The governance, control, jurisdiction, organization, and
managementÂ  of the Texas Tech University
System is hereby vested in the present board of regents of Texas Tech
University, which will hereinafter be known and designated as the board of
regents of the Texas Tech University System.Â 
The board by rule may delegate a power or duty of the board to an
officer, employee, or other agent of the board.

Â 

Tex. Educ. Code Ann. Â§109.001(c) (Vernon 2002).Â Â 
Per that grant, the University enacted specific Âoperating policy and
proceduresÂ allowing an employee to Âelect to remove such issues of grievance
or complaint from further consideration through . . .ÂÂ  the schoolÂs administrative process if
the employee Âfiles substantially the same issuesÂ  . . . with any external agency or court . . .
.ÂÂ  Leach reads this as consent from the
University to sue it in state court.Â  We
disagree for several reasons.

Â Â Â Â Â Â Â Â Â Â Â  First, and assuming arguendo
that any state-supported university has
the power to waive its immunity, such a waiver is not explicit in the
Âoperating policy and proceduresÂ at issue.Â 
Recognizing that an employee may end an internal grievance proceeding if
the same complaint is encompassed within a later suit speaks to whether the
person must exhaust internal administrative remedies before suing.Â  It does not speak to the matter of waiving
immunity.Â  Indeed, nothing in the
procedure even mentions immunity, much less its waiver.Â  And, there are situations requiring the
exhaustion of administrative remedies before suit may be filed, such as when
someone alleges claims under the Texas Whistleblower Act.Â  See Tex. GovÂt Code
Ann. Â§554.006 (Vernon 2004) (requiring the aggrieved employee to
exhaust his existing administrative remedies before filing suit).Â  See also Tex. Civ. Prac.
& Rem. Code Ann. Â§101.101(a)
(Vernon 2005). 

Â Â Â Â Â Â Â Â Â Â Â  Second, that the UniversityÂs legal
counsel, chancellor, or president may have thought Leach had the ability to
prosecute his claims in a court of law (as Leach posits) is of no moment.Â  Admittedly, someoneÂs personal opinion about
the meaning of rules and regulations may be informative or interesting.Â  Yet, they are just that, opinions that may be
informative or interesting.Â  They have no
binding effect on a court since the latter construes legal writings, such as
rules and statutes, de novo.Â  City of San Antonio v.
City of Boerne, 111
S.W.3d 22, 25 (Tex. 2003) (holding that statutes and rules are subject to de
novo review).

Â Â Â Â Â Â Â Â Â Â Â  Finally, and to the extent Leach
argues that the UniversityÂs operating procedures are comparable to state
statutes, we abide by the legislatureÂs unambiguous directive regarding the
waiver of immunity.Â  Again, per that
directive, a statute Âshall not be construedÂ as waiving immunity unless the
Âwaiver is effected by clear and unambiguous language.ÂÂ  Tex. GovÂt Code Ann.
Â§311.034 (Vernon Supp. 2010).Â Â  Those words plainly mean that any waiver one
attempts to derive from a statute must be clear and unambiguous.Â  And, the statute underlying LeachÂs claim of
waiver is Â§109.001(c).Â  According to him,
it purports to vest the UniversityÂs regents with the power to do most anything
they want, including the power to waive immunity.Â  Yet, nothing in it expressly addresses
immunity or its waiver.Â  Nor does Leach
cite us to authority suggesting that the legislature even had the topic of
immunity in mind when enacting the provision.Â 
So, if we were to accept LeachÂs contention, we would have to say that a
legislative statement omitting all explicit or implicit reference to immunity
actually encompasses that subject.Â 
Though some may find it fun to engage in creative legal gymnastics to
achieve a desired end, we opt not to join them.Â 
Instead, our decision is to reject the notion that by enacting
Â§109.001(c) the legislature unambiguously permitted the University to waive its
immunity.Â Â  See
Foster v. Teacher Ret. Sys.,
273 S.W.3d 883, 886-87 (Tex. App.ÂAustin
2008, no pet.) (rejecting the argument that because
the legislature vested the Texas Retirement System with the power to adopt
necessary rules and procedures, the System had the implied power to waive its
immunity and stating that administrative agencies created by the legislature
cannot waive immunity on behalf of the legislature). 

B.Â Â Â 
Â Whistleblower Claim

Â Â Â Â Â Â Â Â Â Â Â  Next, Leach argues that the trial
court erred in dismissing his whistleblower claim.Â  We again disagree and overrule the issue.

It
is true that suits upon claims arising under what we know as the Texas
WhistleblowerÂs Act, Tex. GovÂt Code Ann.
Â§554.001 et seq. (Vernon
2004) are not barred by sovereign immunity.Â 
Id.
Â§554.0035.Â  Nonetheless, to enjoy that freedom to sue,
the complainant must plead facts establishing jurisdiction.Â  In other words, he must allege facts in his
original petition satisfying the elements of the cause of action for which
immunity has been waived.Â  See State v. Lueck,
290 S.W.3d 276, 883-85 (Tex. 2009) (holding that the elements of Â§554.002(a)
can be considered to determine both jurisdiction and liability).Â  That
did not happen here.Â  Nor do we think his
petition is capable of being amended to meet the requirement given the facts
involved.

The
Whistleblower Act forbids a Âstate or local governmental entity . . . [from]
suspend[ing] or terminat[ing] the employment of, or tak[ing] other adverse
personnel action against, a public employee who in good faith reports a
violation of law by the employing governmental entity or another public
employee to an appropriate law enforcement authority.ÂÂ  Tex. GovÂt Code Ann.
Â§554.002(a) (Vernon 2004).Â 
Furthermore, a Âreport is made to an appropriate law enforcement
authority if the authorityÂ receiving the report Âis a part of a state or local
governmental entity . . . that the employee in good faith believes is
authorized to . . . regulate under or enforce the law alleged to be violated .
. . or . . .Â investigate or prosecute a violation of criminal law.ÂÂ  Id. Â§554.002(b).Â  Here, the alleged report consisted of Leach
filing suit against the University, among others, in the district court.Â  

The
legislature did not explain what it meant by ÂreportÂ when drafting
Â§554.002.Â Â  Yet, we hold that it did not
include the specific situation here, given applicable rules of statutory
construction.Â  Per those rules, our
primary objective is to ascertain and give effect to the legislature's intent.Â  Tex. DOT v. City of Sunset Valley, 146 S.W.3d 637, 642
(Tex. 2004).Â  This obligates us to consider 1) the plain
and common meaning of the words utilized in the writing, 2) the context in
which those words were used, 3) the objective sought by the legislature, and 4)
the consequences of a particular construction.Â 
Id.;
accord Tex. GovÂt Code Ann. Â§311.011(a) (Vernon 2005) (stating that
when words appearing in a statute are not defined by legislature, those
interpreting them must read them in context and construe them according to the
rules of grammar and common usage).Â  

According
to the dictionary, a ÂreportÂ consists of relating, disclosing, or accounting
for particular facts, events, circumstances or things.Â  See
Merriam-WebsterÂs Collegiate Dictionary 1056
(11th ed. 2003).Â  A report
card, for instance, gives an account of a studentÂs grades while a police
report relates the supposed facts of an event.Â 
So, if one was to only consider this commonly understood meaning of
report, it would be rather easy to conclude that an original petition
commencing a lawsuit falls within the realm of a report.Â  Indeed, most petitions, if appropriately
drafted, disclose circumstances or misconduct that the complainant views as
entitling him to relief.Â  However, the
consideration of criteria in addition to the plain meaning of the word is
necessary if we are to abide by the mandate of the Supreme Court.

One
of those additional criteria is the context within which the word appears.Â  The relevant context here includes reference
to an Âappropriate law enforcement authority.ÂÂ 
Again, such an entity is one charged with the ability to enforce or
regulate the laws purportedly breached or investigate the breach of those
laws.Â  Tex. DOT v. Needham, 82
S.W.3d 314, 319-20 (Tex. 2002).Â 
The description calls forth visions of police, administrative agencies,
district attorneys, the attorney general, and like bodies commonly associated
with investigating and enforcing the law.Â 
It takes a much greater stretch of the imagination to include a district
court within the category.Â  Indeed, precedent
recognizes that the role of the judiciary excludes investigative or executive
functions of the type contemplated by the statute.Â  Robertson
County v. Wymola, 17 S.W.3d 334, 341 (Tex. App.ÂAustin 2000, pet. denied) (involving a
whistleblower complaint).Â  And, the void
is not filled simply because a district court has some ÂgeneralÂ authority to
intercede in legal matters, especially when that authority is adjudicative as
opposed to investigative or regulatory.Â  See Tex. DOT v. Needham,
82 S.W.3d at 319-20 (stating that it is not enough for the entity to have
general authority to investigate or regulate a matter).Â  

We
further note that portion of the act requiring the whistleblower to exhaust
administrative remedies before seeking judicial relief.Â  That is, the statute clearly obligates the
aggrieved employee to Âinitiate action under the grievance or appeal procedures
of the employing state or local governmental entity relating to suspension or
termination of employment or adverse personnel action before suing.ÂÂ  Tex. GovÂt Code Ann. Â§554.006(a)
(Vernon 2004).Â  It
makes little sense to have this requirement if filing an original petition in a
court of law constitutes an acceptable report under the act.Â  See
Wilson v. Arlington Indep. Sch. Dist., No. 4:00-CV-0069-A, 2001 U.S. Dist. Lexis 10715, at *12 (N.D. Tex. July 26,
2001) (stating that unless administrative remedies are exhausted per the
statute, a trial court lacks subject matter jurisdiction over the whistleblower
complaint).Â  Indeed, to hold otherwise
would be tantamount to negating the obligation to first pursue administrative
avenues of relief, and we must endeavor to read a statute in a way that negates
no portion of it.Â  Mid-Century Ins.
Co. v. Ademaj, 243 S.W.3d 618, 621 (Tex. 2007).

Simply
put, the factual allegations contained in LeachÂs petition, the context in
which the word ÂreportÂ appears, and the traditional purpose of the judiciary
lead us to conclude, as a matter of law, that filing a lawsuit against the
University and others failed to satisfy the mandate of Â§554.002(a).Â  This is not to say that circumstances unlike
those at bar may lead to a different result.[4]Â  But, filing suit to redress claims of
breached contract and constitutional deprivation arising from the termination
of the complainantÂs job is not such a circumstance.Â  

As
for the argument that all Leach needed was to believe, in good faith, that his
lawsuit constituted the requisite report, we say the following.Â  It is true that the employee need only have a
good faith belief that he is complying with the elements of Â§554.002(a).Â  Tex. DOT v. Needham,
82 S.W.3d at 320; Potter
County v. Parton, No. 07-03-0338-CV, 2005 Tex. App. Lexis 4381, at *8-9 (Tex. App.ÂAmarillo June 8, 2005, no pet.).
Yet, good faith involves more than what the employee may have believed
subjectively.Â  Potter County v. Parton, 2005
Tex. App. Lexis 4381, at
*8-9.Â  Rather, the phrase has two
components, one subjective (i.e.
what the employee actually believed) and the other objective (i.e. whether a
reasonably prudent person in the same circumstances could have thought
that).Â Â  Id.Â 
And, whether the latter component exists depends on circumstances such
as the information available to the employee, his education and experience, the
nature of the dispute, and the nature of the entity involved, for example.Â  See
id. at *10 (describing
the objective component as being a Âreasonable [belief] in light of [the
reporting employeeÂs] training and experienceÂ).

Here,
the complainant was a successful NCAA division one football coach with a
college degree and who received post-graduate legal training.Â  One can reasonably assume that it takes a bit
of savvy and intelligence to successfully field a team at that level of play
and navigate through the morass of NCAA rules and regulations.Â Â  Moreover, a person having such an
educational background and professional skills is somewhat different than the
ordinary layman unskilled in interpreting technical or legal jargon.Â  To this, we add the circumstance that Leach
was not left alone to sojourn through a legal maze once the University
initiated steps to discipline him.Â  He
had several attorneys to help him uncover, analyze, and apply the laws of
Texas.Â  Together, they not only dealt
with the UniversityÂs allegations but also filed the lawsuit before us.Â  Moreover, the judicial precedent and
statutory writings upon which we rely were available to them, as well.Â  Given this, we arrive at but one
conclusion.Â  A reasonable person in the
same circumstances and having the same experience, education, and legal help as
Leach would not have ignored statutorily mandated exhaustion requirements and
pertinent judicial writings to deduce that filing a lawsuit satisfied the
elements of Â§554.002(a).[5]Â  In short, no evidence exists enabling us to
conclude that Leach satisfied the objective prong of a good faith belief.Â Â  

C.Â Â 
Â Constitutional Claims

Â Â Â Â Â Â Â Â Â Â Â  We next address the argument that
the trial court erred in dismissing LeachÂs constitutional claims.Â  The claims in question involve the purported
taking without compensation of LeachÂs property and his termination without due
process.[6]Â  We overrule the issues in part.

1.Â Â Â  Takings Claim

Â Â Â Â Â Â Â Â Â Â Â  With regard to the takings claim, we
find the Supreme CourtÂs decision in General Servs. CommÂn v.
Little-Tex Insulation Co., 39
S.W.3d 591 (Tex. 2001) dispositive.Â  According to the Supreme Court in Little-Tex, to establish a takings claim, the
complainant must prove 1) that the State intentionally performed certain acts,
2) that the acts resulted in a ÂtakingÂ of property, and 3) that the property
was taken for public use.Â  Id. at 598.Â 
These elements are not satisfied when the State withholds property in a
contractual dispute.Â  This is apparently
so because the party demanding compensation after performing his contractual
duty to provide goods or services actually provided those goods or services
voluntarily as opposed to being forced to do so via the StateÂs power of
eminent domain.Â  Id. at 598-99, quoting
State v. Steck Co., 236
S.W.2d 866 (Tex. Civ. App.ÂAustin 1951, writ refÂd).Â 
So, when the State withholds property under color of a contractual
right, such as when it believes the contract was not properly performed, it is
not acting as a sovereign invoking powers of eminent
domain, but rather as a private party to a contract invoking rights expressed
or implicit in the contract.Â  Id. at 599.Â 
Thus, the takings clause appearing under Texas
Constitution art. I, Â§17
does not apply to contractual disputes. [7]Â 


Â Â Â Â Â Â Â Â Â Â Â  The compensation sought by and
allegedly due Leach is that which the University contracted to pay him in
return for his performance of services as the head football coach.Â  The University purports to withhold that
compensation because Leach failed to abide by the terms of their accord.Â  Thus, what we have here is nothing other than
a contractual dispute described in Little-Tex and which falls outside the takings
clause.Â  

2.Â Â Â  Denial of Due Course of Law

Â Â Â Â Â Â Â Â Â Â Â  As for the dispute regarding due
process, Leach argues that he was denied constitutionally protected interests
without due course of law.Â  The property
rights at issue were to 1) continue employment for a term of years (except when
terminated for cause) and 2) specific compensation accruing while so
employed.Â  And because he tendered
sufficient evidence establishing the constitutional claim, it allegedly was
error for the trial court to use the doctrine of sovereign immunity to dismiss
it.Â  We sustain the issue for several
reasons.

Â Â Â Â Â Â Â Â Â Â Â  Sovereign immunity bars a trial
court from adjudicating lawsuits through which a complainant seeks money
damages from the State.Â  Tex.
Natural Res. & Conservation CommÂn v. IT-Davy, 74 S.W.3d 849, 853 (Tex. 2002).Â 
It does not pretermit legal actions against a governmental entity
seeking equitable relief to redress violations of the Texas Constitution.Â  City
of Elsa v. M.A.L., 226
S.W.3d 390, 392 (Tex. 2007); City of Beaumont v. Bouillion, 896 S.W.2d 143, 149 (Tex. 1995); City
of Arlington v. Randall, 301
S.W.3d 896, 906-07 (Tex. App.ÂFort Worth 2009, pet. filed).Â 
One means of determining whether constitutional violations have occurred
that survive the invocation of sovereign immunity is through prosecuting a
declaratory action.Â  Id.
at 908-09; Andrade v. NAACP of Austin, 287 S.W.3d 240, 251 (Tex. App.ÂAustin
2009, pet. granted).Â  Leach requested such declaratory relief here
when seeking a declaration of whether he was denied a constitutionally
protected interest by the University without due course of the law.Â  See Tex. Const. art. I, Â§19 (stating that Â[n]o citizen of
this State shall be deprived of life, liberty, property, privileges or
immunities, or in any manner disfranchised, except by the due course of the law
of the landÂ).Â  Admittedly, he cannot avoid the shield of sovereign
immunity by simply morphing a demand for monetary relief into one for
declaratory relief, City of El Paso v. Heinrich, 284 S.W.3d at 370-71, and that is what
the University contended he did here.Â 
That is, it argued through its plea to the courtÂs jurisdiction that his
pleadings regarding the due course of law violations were Âa disguised attempt
to obtain money damages under the 2009 Contract recast as a declaratory
judgment claim.ÂÂ  Yet, whether Leach had
a constitutionally protected interest (property or liberty) that was denied him
without due process is quite distinct from whether the University breached the
employment contract.Â  It is possible for
there to be a due process violation without a breach of contract or a breach of
contract without a due process violation.Â 
So, simply because both types of claims may be included in the same
petition does not ipso facto mean that the constitutional allegation is a mere
Âdisguised attempt to obtain money damagesÂ for a breach of contract.Â  Examining the nature of the relief sought is
determinative for one may invoke the jurisdiction of Texas courts via a
declaratory action to redress, through equitable remedies, unconstitutional
acts.Â  City
of Elsa v. M.A.L., supra.Â  So, the trial court
had jurisdiction to declare whether Leach was denied due course of law even
though it cannot adjudicate the attempt to recover damages for breach of
contract.Â Â  The same may be true for
other choses-in-action that he may assert and which are independent of his
breach of contract claim; they must be assessed on an individual basis.Â  

Â Â Â Â Â Â Â Â Â Â Â  D.Â  Dismissal of Bailey, Myers, and Bingham

Â Â Â Â Â Â Â Â Â Â Â  Leach next contends that the trial
court erred in dismissing the claims asserted against President Bailey,
Athletic Director Myers and Vice-Chancellor Bingham in their official
capacities simply because he had sued the University as well.Â  We dismiss this particular contention for
want of jurisdiction.Â  

Â Â Â Â Â Â Â Â Â Â Â  The trial courtÂs decision was not
founded upon sovereign immunity but rather its construction of Â§101.106 of the
Texas Civil Practice and Remedies Code.Â 
The latter deals with a plaintiffÂs decision to sue both a governmental
unit and its employees and bars the plaintiff from suing both.Â  Tex.
Civ. Prac. & Rem. Code Ann. Â§101.106(a) (Vernon 2005) (stating that
the filing of a suit under the tort claims act against a governmental unit
constitutes an irrevocable election by the plaintiff and bars any suit or recovery
against the individual employee regarding the same subject matter).Â  

Â Â Â Â Â Â Â Â Â Â Â  Next, our jurisdiction is not
plenary.Â  We can only review suits
wherein a final judgment or order has been entered.Â  Lehmann
v. Har-Con Corp., 39
S.W.3d 191, 195 (Tex. 2001).Â  This is not true, though, if the dispute
encompasses an issue addressed in Â§51.014 of the Texas Civil Practice and
Remedies Code.Â  In such situations, we
may consider the dispute though the trial court has yet to dispose of the
entire action.Â  Tex. Civ. Prac. & Rem. Code Ann. Â§51.04 (Vernon
2005).Â  Dismissing governmental employees
under Â§101.106 because the plaintiff sued their employer falls within none of
the categories itemized in Â§51.014.Â  It
does not involve 1) receivers or trustees or their appointment or removal, 2) a
temporary injunction, 3) the denial of a motion for summary judgment based on
an assertion of immunity, 4) a special appearance, 5) a plea to the trial
courtÂs jurisdiction filed Âby a governmental unit,Â or any other topic
mentioned in the statute.Â  So, because
the order of dismissal from which appeal was taken does not dispose of all
claims asserted against all defendants (i.e. Craig James, Larry Anders, and Jerry
Turner) we have no jurisdiction to resolve this aspect of the appeal.Â  The particular dispute remains before the
trial court should it care to consider its decision in light of the Supreme
CourtÂs recent opinions in Tex. Lottery CommÂn v. First State
Bank of DeQueen, 323
S.W.3d 628 (Tex. 2010) and City of El Paso v. Heinrich. Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  The
UniversityÂs Appellate IssuesÂ Â Â  

A.Â Â Â 
Breach of Contract

Â Â Â Â Â Â Â Â Â Â Â  Through its sole issue, the
University argues that the trial court erred in refusing to dismiss LeachÂs
breach of contract allegation.Â  Again,
the trial court refused to do so because it reasoned that the University
Âwaived its immunity from suit . . . by and through its conduct.ÂÂ  We sustain the issue.

Â Â Â Â Â Â Â Â Â Â Â  As previously mentioned, the Supreme
Court left open, in Federal Sign, the question of whether the state entity may waive its
immunity through its conduct.Â Â  Yet,
whether the idea of waiving immunity through conduct extends to
choses-in-action sounding in breach of contract is not an open question.Â  In General Servs.
CommÂn. v. Little-Tex Insulation Co., Little-Tex sued Texas A&M for
breach of contract and argued that the school waived its immunity by accepting
the benefits of the contract.Â  The
proposition was rejected by the Supreme Court after acknowledging that it had
left open Âthe question of whether the StateÂs conduct may waive its immunity
from suit.ÂÂ  General
Servs. CommÂn v. Little-Tex Insulation Co.,
39 S.W.3d at 595.Â 
The Court rather clearly stated that Âthere is but one route to the
courthouse for breach-of-contract claims against the State, and that route is
through the Legislature.ÂÂ  Id. at 597; accord Tex. Parks
& Wildlife DepÂt v E. E. Lowrey Realty, Ltd., 235 S.W.3d 692, 695 n.2 (Tex. 2007) (stating that ÂLowrey
could only pursue a breach of contract claim against the State if he first
obtained legislative consent . . .Â); Tex. Natural Res.
Conservation CommÂn. v. IT-Davy,
74 S.W.3d at 856-57 (rejecting application of the waiver-by-conduct doctrine in
breach of contract suits and reaffirming that only the legislature can waive
immunity).

Â Â Â Â Â Â Â Â Â Â Â  Admittedly, the factual
circumstances in Little-Tex differ from those before us.Â  And, because of that Leach argues that the
holding does not control the outcome here.Â 
Though the circumstances may differ between the two suits, the Supreme
Court in Little-Tex actually
focused not upon the facts underlying the cause of action but rather upon the
cause of action itself, that is, the claim of breached contract.Â  Nor did it simply say that a governmental
entity retains its immunity even though it accepted contractual benefits.Â  Rather, it told us that there was only one
way the State could be sued for breach of contract and that involved first
garnering the legislatureÂs approval via chapter 107 of the Texas Civil
Practice and Remedies Code.Â Â  See
Employees Retirement Sys. v. Putnam, LLC., 294 S.W.3d 309, 327 (Tex. App.ÂAustin
2009, no pet.) (also recognizing the Supreme CourtÂs
Ârejection of the waiver-by-conduct doctrine since Federal
SignÂ in suits for breached contract).Â  

Â Â Â Â Â Â Â Â Â Â Â  We also recognize that our opinion
contradicts that in Texas Southern University v. State Street
Bank & Trust Co., 212
S.W.2d 893 (Tex. App.ÂHouston [1st Dist.] 2007,
pet. denied).Â  In that breach of contract
case, the intermediate court of appeals held that the UniversityÂs conduct
resulted in the waiver of its immunity.Â 
That decision, however, contradicts the Supreme CourtÂs statements in Little-Tex, IT-Davy, and E. E. Lowrey Realty, Ltd. about the only avenue for redress
being through the Texas Legislature.Â  If
the highest civil court in Texas truly means what it said, then the holding in State
Street simply is wrong.Â  If, on the other hand, there may still be
instances akin to those in State Street warranting the application of waiver
by conduct, then the SupremeÂs CourtÂs utterances about the legislature having
the exclusive authority to waive sovereign immunity are inaccurate.Â  In either case, it is a matter for the
Supreme Court (or Texas Legislature) to resolve, and we have no choice but to
abide by their decision.Â  

In
sum, we reverse those portions of the trial courtÂs order 1) dismissing, for
want of jurisdiction, LeachÂs due course of law claim and request for non-monetary
declaratory and equitable relief founded upon it and 2) concluding that Texas
Tech University waived its sovereign immunity from the breach of contract claim
due to its conduct.Â  We next dismiss, for
want of jurisdiction, the appellate issue involving whether Bailey, Myers, and
Bingham were properly dismissed by the trial court, render judgment dismissing
LeachÂs claim of breached contract against the University, and affirm the
remainder of the order granting the pleas to the trial courtÂs
jurisdiction.Â Â Â  

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Brian
Quinn

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Â Â Â Â Â Â Â Â Â  Chief JusticeÂ Â  

Â 











[1]Tex. Const. art. I, Â§2.Â  





[2]Dare
we infer that this was an early example of judicial activism?





[3]Some
may think it ironic that sovereign immunity remains viable given the wording of
our Texas Constitution.Â  Again, it
mandates that Â[a]ll political power is inherent in the people, and all free governments are founded
on their
authority, and instituted for their
benefit.ÂÂ  Tex. Const. art.
I, Â§2 (emphasis added).Â  Thus, true
sovereignty lies in the people of Texas, not the government they created.Â  Kemper v. State,
138 S.W. 1025, 1043 (Tex. Crim. App.Â  1911) (stating that Â[t]he rule in America is
that the American people are the sovereigns, and in them is lodged all power,
and the agencies of government possess no authority save that which is
delegated to them by the people in the written compactÂ . . . which is
styled the ÂConstitutionÂ . . . .Â).Â 
That the true sovereign may be subjected to suit without consent while
their creation cannot seems to diminish the meaning of art. I,
Â§2 of the Constitution.Â Â Â  





[4]For
instance, a district judge may well be the appropriate authority with whom to
file a report if the complaint involves the misconduct of a county
auditor.Â  Since the latter post is filled
by a district judge, Tex. Loc. GovÂtÂ  Code Ann. Â§84.002(a)
& (b) (Vernon 2008), and the district judge also may remove the auditor, id. Â§84.009, then a
district judge may be the one best able to address the incident.Â Â  But, that is not a question we must decide
today.





[5]That
Leach cites us to City
of Elsa v. Gonzalez, 292 S.W.3d 221 (Tex. App.ÂCorpus
Christi 2009) revÂd, Â 2010 Tex. Lexis
693 (Tex. October 1, 2010) as indicating that a constitutional county judge may
be an acceptable authority with whom to file a report is of no import.Â  This is so for several reasons.Â  First, the Supreme Court reversed the cited
opinion and instead held that Gonzalez failed to satisfy the need to file, in
good faith, a report with the pertinent authority.Â  City
of Elsa v. Gonzalez, No. 09-0834, 2010 Tex. Lexis 693, at *15 (Tex. October 1,
2010).Â  Second, the office and duties of
a constitutional county judge are quite different from those of a county court
at law or district court judge.Â Â 
Admittedly, each exercises adjudicative powers, but a constitutional
county court judge actually acts as the administrative head of the county and
runs, with the help of commissioners, that level of government.Â  So, the hat he wears is also highly
legislative and executive in nature.Â 
Moreover, in performing his legislative and executive duties, a
constitutional county judge is much more likely to be lawfully obliged to
investigate and regulate matters of the county and coffers he oversees than
would be a district judge viz
the
conduct of a state chartered university.Â 
Finally, and as noted by the Supreme Court in its City of Elsa
opinion, the appropriate authority contemplated in the Whistleblower Act is one
that can do more than simply act in a remedial manner.Â  Id. at *14, citing Duvall v. Tex. DepÂt of Human
Services, 82 S.W.3d 474, 481-82 (Tex. App.ÂAustin 2002, no pet.).Â  Since a constitutional county court judge
exercises legislative and executive powers, his post affords him greater
ability to act in ways other than remedial.Â 
The same generally cannot be said of either a county court at law and
district court judge whose acts are remedial in nature, i.e. they adjudicate
disputes and remediate purported wrongs.Â Â 






[6]According
to his live pleading, Leach restricts his due process claim to the rights
emanating from art. I, Â§19 of the Texas Constitution.Â  Nothing is said about the Due Process Clause
contained in either the Fifth or Fourteenth Amendments to the United States
Constitution.

Â 





[7]That
the State is not acting as a sovereign (but rather a private party) when
withholding money due under a contract but nonetheless enjoys immunity from
suit for withholding that money because it is deemed the sovereign is somewhat
of a contradiction.Â  No doubt there is a
reasonable explanation for the apparent inconsistency, and the Supreme Court is
in the best position to explain it.