# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00797-CR

**Dana Snokhous, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
### NO. 08-02786-1, HONORABLE SUZANNE BROOKS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Dana Snokhous of the offense of driving while intoxicated. *See* Tex. Penal Code Ann. § 49.04 (West 2003). Punishment was assessed at 180 days' confinement and a $2,000 fine, but the trial court suspended imposition of the sentence and placed Snokhous on community supervision for 24 months. In two points of error, Snokhous asserts that the trial court abused its discretion in admitting hearsay testimony and that trial counsel rendered ineffective assistance by failing to object to evidence that Snokhous refused to submit a blood specimen for analysis. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that on the night of April 13, 2008, Snokhous crashed her car in an open field located in a Round Rock neighborhood. The crash was observed by witnesses Christopher Greenstein and Jonathan Anderson, who were playing a game of pool in Anderson's

garage. Greenstein testified that, as he was racking the pool balls, he heard tires squealing, looked up, and saw a maroon Tahoe make a sharp left turn and "just keep on turning and go up, hop the curb into the open field." The vehicle then "glanced off a little stand of cedar trees" and came to a stop. The vehicle attempted to exit the field but "got hung up on a big boulder."

Greenstein then "ran across the street to see if [the driver] was okay." In court, Greenstein identified Snokhous as the driver of the vehicle. Greenstein recounted that he opened the door to the vehicle and noticed the smell of alcohol. He observed that Snokhous did not appear injured in any way. Greenstein testified, "I asked her if she was okay. The Defendant said help me and that's when I really smelled alcohol and her head was swaying, speech was slurred." Greenstein reached into the car, put the vehicle in park, turned it off, and took the keys. Greenstein did so out of concern that "things could get worse" if she was able to drive away. He explained, "Well, I mean she was obviously, in my opinion, at that time intoxicated, inebriated and I had concerns about her making it safely to the house." Greenstein then returned to Anderson's house and called 911.

While Greenstein was making the call, he continued, Snokhous's husband, David, arrived and, with Anderson's help, succeeded in getting the vehicle off the rock. Greenstein testified that David drove the car out of the field while Snokhous, who was no longer in the vehicle, "attempted to walk down the sidewalk to [her] house." According to Greenstein, "I saw her having trouble walking a straight line, you know, stumbling, not very good control and actually fell down a couple of times between, you know, where we were located and my house."

Anderson testified that he also witnessed the vehicle "crash into the curb and then go out into that open field across the street." He explained, "It went through the field, hit a tree, vehicle

2

sat there for a few seconds, back up, tried to get off the tree, couldn't immediately get off, went forward a little bit, put it back in reverse and then eventually got off the tree and then started to turn around at which point it got lodged" on a boulder. Anderson opined that the turn Snokhous had tried to make, which he testified was at a 90-degree angle, required drivers to slow down but that Snokhous had not slowed down "until she hit the tree."

While Greenstein was calling 911, Anderson approached the vehicle to check on the condition of the driver. When he spoke with Snokhous, Anderson recounted, he noticed that "she was crying. Kind of, you know, just mumbling. It was hard to understand what she was saying. Visibly upset. . . . And she just kind of kept saying the same thing, you know, help me, help me, over and over was really all she said." Anderson added, "I could smell alcohol and just her overall demeanor, . . . I mean, she was struggling." Both Anderson and Greenstein testified that the smell of alcohol on Snokhous got stronger when she was speaking with them.

Anderson testified that David assisted Snokhous in getting out of the vehicle, started the vehicle using an extra set of car keys, and attempted to get it off the rock. Eventually, with help from Anderson, he was able to do so. David then asked Snokhous to get in the vehicle, but, according to Anderson, she refused. Anderson recalled that, at that point, Snokhous seemed "irritated" and "agitated." David then drove away in the vehicle, and Snokhous "started to walk home." Anderson also noticed that Snokhous had difficulty walking: "She was walking down the field side of the street on the sidewalk and probably walked 15 to 20 feet and fell down. We were standing on the driveway and then she got back up, started to walk across the street, . . got to the curb and fell down again, picked herself back up." Anderson was asked how intoxicated he thought

3

Snokhous was, "on a scale from one to ten with one being the least intoxicated person you've ever seen and ten being the most intoxicated person you have ever seen." Anderson replied, "I would put her at about an eight on that scale."

Officers Tate Hunter and Jonathan Miner of the Round Rock Police Department responded to the 911 call. Hunter testified that he was told by dispatch that there had been a single-vehicle accident involving an intoxicated driver. When Hunter arrived at the scene of the accident, he spoke with both Greenstein and Anderson. Both men reported what they had observed regarding the crash and Snokhous's behavior, and they informed Hunter that they believed she was intoxicated.

Hunter and Miner then went to Snokhous's house to continue their investigation. They observed the Tahoe in the driveway and noticed grass, dirt, and debris in and around the front bumper. However, neither officer observed any significant damage to the vehicle. They then approached the front door of the residence, announced their presence, and were greeted by David. Hunter recalled, "Officer Miner asked David if his wife was at the house and he said yes. And at that time [we] observed the female Dana to walk up to the front door." Hunter recalled his observations as she approached: "My initial observation is that she's uneasy on her feet, she's staggering, swaying, and as she approaches the door frame she has to use the door frame to support herself and is unable to stand without assistance of the door frame." Also, Hunter testified, "She had a strong odor of alcohol on her person and I could tell that her eyes were glazed and watery and bloodshot." Hunter first noticed the smell of alcohol emanating from Snokhous when she was "between five to seven feet" away from him. Hunter added that he had not smelled alcohol when David had first opened the door and the officers were speaking with him.

4

Hunter proceeded to ask Snokhous how the accident had happened. While Snokhous was talking to Hunter, he "noticed she had real thick, slurred speech." According to Hunter, Snokhous told him "that about 15 minutes ago she was driving and ran off the roadway," but "she didn't know how it happened." Snokhous also told Hunter that she was on her way home from a local bar where she works as a bartender. Snokhous then admitted "that she had drank two shots of Goldschlager liquor about two hours prior to leaving." Hunter explained to the jury that Goldschlager is a liquor that is probably "50 to 60 percent alcohol if I had to guess. It's a clear liquor." On cross, Hunter acknowledged that Goldschlager does not contain as much alcohol as "hard liquors" such as Everclear, but on redirect he added, "Well, it's a lot more [alcohol] than drinking a beer. I mean, I would say it's closer to having a shot of whiskey than it would—a stronger whiskey than it would be somebody sipping a small glass of wine and having a domestic light beer or something."

Hunter then asked Snokhous if she had any injuries, and she told him that her "ear hurt very bad." Hunter offered to call an ambulance to take her to a hospital, which Snokhous accepted. Hunter explained that when EMS is requested, it is standard operating procedure for the police not to perform any field sobriety tests. For that reason, Hunter testified, he did not perform any such tests on Snokhous. However, while EMS was en route, Hunter continued the investigation. He asked Snokhous if she had anything to eat or drink or had taken any medication since she had arrived home. Snokhous said she had not and told him "that all she had done once she went inside was use the rest room."

Hunter also testified concerning David's demeanor and statements while the officers were at the house. Hunter testified, "He's kind of almost just laid back. He doesn't really care. He's kind of—kind of just whatever happens happens kind of attitude." Hunter also testified that he was advised by David "that when [Snokhous] walked into the house after her wreck she fell down and hit her head." Finally, over a hearsay objection by defense counsel, Hunter was asked if David made "any comments that led you to believe that he was under the impression that his wife was intoxicated." Hunter testified, "The statement that David made to me was whatever you guys can do to keep her out of a DWI I would really appreciate it."

After EMS arrived, Snokhous was transported to the hospital. Hunter and Miner arrived shortly thereafter and, once they met up with her in the emergency room, placed her under arrest for driving while intoxicated. Hunter requested a specimen of her blood, which Snokhous refused to give. Hunter then advised her that because she was at the hospital, it was standard operating procedure to release her, get a warrant for her arrest, and take her into custody after she had been released from the hospital. The officers arrested her the next day.

Officer Miner's testimony was largely consistent with Hunter's testimony. Miner similarly observed Snokhous stumbling as she walked toward the front door, having trouble keeping her balance, swaying "from side to side," and leaning against the door "to help her stay upright." He also "smelled a strong odor of an alcoholic beverage coming from her" that he had not smelled when David had opened the door. Miner testified that Snokhous had told him that, while she was at the bar, she had drank "two or three shots of liquor." Both Hunter and Miner testified that, in their

6

opinion, based on what they had learned during the investigation and their prior experience investigating DWIs, Snokhous had been operating a motor vehicle while she was intoxicated.

Dillon Eastwood, an EMS paramedic, examined Snokhous when the ambulance arrived at the house at approximately 10:00 p.m. Eastwood testified that during the examination, Snokhous told him that she had consumed "five shots" of alcohol since 7:00 p.m. that night. Eastwood also noted during the examination that Snokhous exhibited "slurred speech." Eastwood testified that he has responded to thousands of car accidents over the course of his career, that "quite a few" of them involved alcohol, and that, in his opinion, alcohol played a role in Snokhous's accident.

Tracey Lewis, another EMS paramedic who had examined Snokhous, testified similarly. Lewis noticed that Snokhous had "slurred speech" and "an alcohol-like smell." Lewis also recalled that Snokhous "was having some issues remembering some things like phone numbers." Lewis concluded that she believed Snokhous was intoxicated while she was speaking with her and that alcohol had played a role in the accident that night.

Stacy Domel, a registered nurse who had treated Snokhous at the hospital where Snokhous was admitted, also testified. Domel explained that when she was treating Snokhous, she asked her "if there was alcohol use prior to arrival." According to Domel, Snokhous "stated to me specifically three Goldschlager which I recorded in my notes for the physician to have to review." Domel also observed "that there was a smell of alcohol on her breath." However, on cross-examination, Domel also recalled that Snokhous was "alert and oriented" when she examined her.

Snokhous's medical records from her hospital visit were admitted into evidence. An emergency room report included in the records indicates that, by the time of Snokhous's discharge from the hospital, she was "not currently clinically intoxicated." Domel testified that this assessment was made at approximately 1:00 a.m., over two hours after Snokhous had arrived at the hospital.

Following Domel's testimony, the State rested its case. The defense then rested its case without calling any witnesses. The jury found Snokhous guilty of driving while intoxicated. Following a sentencing hearing before the trial court, Snokhous was placed on community supervision for 24 months. This appeal followed.

## ANALYSIS

**Hearsay**

In her first point of error, Snokhous asserts that the trial court abused its discretion in admitting over objection the following testimony by Officer Hunter: "The statement that David made to me was whatever you guys can do to keep her out of a DWI, I would really appreciate it." Snokhous contends that this statement was inadmissible hearsay. The State responds that the statement was admissible under an exception to the hearsay rule. *See* Tex. R. Evid. 803(1) (present sense impression), (24) (statement against interest). Alternatively, the State argues that any error in the admission of the statement was harmless.

Assuming without deciding that the above statement was inadmissible hearsay that does not fall under one of the exceptions to the hearsay rule, we cannot conclude on this record that Snokhous was harmed by its admission. A violation of the evidentiary rules that results in the erroneous admission of evidence is non-constitutional error. *See King v. State*, 953 S.W.2d 266,

8

271 (Tex. Crim. App. 1997). Any non-constitutional error "that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

Having reviewed the record, we have fair assurance that the alleged hearsay did not influence the jury, or had but a slight effect. This was a case in which several witnesses—two eyewitnesses to the accident, two police officers, two paramedics, and a registered nurse—each provided extensive testimony tending to show that Snokhous had operated a motor vehicle while intoxicated. Greenstein and Anderson, both of whom were eyewitnesses to the accident, testified that they smelled alcohol on Snokhous when they approached her immediately after the crash and that the smell was stronger when she was talking to them. Greenstein testified that her head was swaying and her speech was slurred; Anderson testified that she was mumbling and "kept saying the same thing, you know, help me, help me, over and over." Also, Anderson testified that, prior to the crash, Snokhous had not slowed down "until she hit the tree," even though, according to Anderson, the turn was at a 90-degree angle that required a slow rate of speed to successfully navigate. Greenstein testified that he had heard "tires squealing" immediately before the crash. Moreover, Greenstein and Anderson both testified that, as Snokhous was walking away from the accident (after she had refused to get into the car with her husband), she was stumbling, had trouble walking in a straight line, and fell down on two separate occasions.

Officers Hunter and Miner each testified that, in his opinion, Snokhous had been intoxicated while she was operating a motor vehicle. They came to this conclusion after personally observing such things as her slurred speech, her "glazed," "watery," and "bloodshot" eyes, and her difficulty in walking and maintaining her balance as she stood near the door. They both smelled a strong odor of alcohol coming from Snokhous as she approached them (according to Officer Hunter, as soon as she was "between five and seven feet" away from him) and that they had not smelled alcohol when her husband had first greeted them at the door. Moreover, both officers testified that Snokhous admitted to them that she had drank either two or three shots of Goldschlager liquor that night.

The medical professionals who had treated Snokhous testified to similar observations. Eastwood noted that Snokhous exhibited "slurred speech." Lewis likewise noticed that Snokhous had "slurred speech" and "an alcohol-like smell." Lewis also recalled that Snokhous "was having some issues remembering some things like phone numbers." Moreover, Eastwood testified that Snokhous had told him that she had consumed "five shots" of liquor since 7:00 p.m. that night. The accident happened at approximately 10:00 p.m. Both Eastwood and Lewis testified that they believed alcohol "played a role" in Snokhous's accident. Finally, Nurse Domel testified that Snokhous had admitted to her that she had consumed three Goldschlager shots and "that there was a smell of alcohol on her breath." Thus, the evidence shows that Snokhous had admitted to multiple witnesses that she had drank between two and five shots of liquor that night less than three hours prior to her accident. Hunter testified that Goldschlager liquor, although not containing as much alcohol as Everclear, was similar to a "stronger whiskey."

10

The defense theory at trial was that because Snokhous was working as a bartender the night of the accident, she had been in close proximity to people who were drinking, and the smell of alcohol was coming from Snokhous's clothing rather than her breath. There was also some evidence tending to show that Snokhous may not have been intoxicated at some point during her hospital stay, namely the assessment in the emergency room report that Snokhous was "not currently clinically intoxicated" upon her discharge from the hospital and Domel's testimony that Snokhous was "alert and oriented" during her examination. However, the evidence tending to show that Snokhous was intoxicated at the time of the accident and shortly thereafter can be fairly characterized as overwhelming.

We also observe that Officer Hunter testified to the alleged hearsay statement at only one point during trial; the statement was not repeated at other points during his testimony or the testimony of Officer Miner. Also, the State mentioned the alleged hearsay only once during its closing argument. Most of the State's argument concerned the other evidence in the case, which we have summarized above. Thus, the alleged hearsay was not emphasized by the State either during the presentation of evidence or during argument.

We cannot conclude on this record that the alleged hearsay influenced the jury or had but a slight effect. Accordingly, we must conclude that the admission of the alleged hearsay did not affect Snokhous's substantial rights and was harmless.

We overrule Snokhous's first point of error.

11

**Ineffective Assistance**

In her second point of error, Snokhous asserts that her trial counsel rendered ineffective assistance by not filing a motion to suppress evidence that Snokhous refused to provide a specimen of blood for analysis. Snokhous claims that her warrantless arrest at the hospital was illegal and, therefore, that her refusal to provide a blood specimen was a "fruit" of the illegal arrest that counsel should have sought to suppress.

To prevail on a claim of ineffective assistance of counsel, a defendant must prove by a preponderance of the evidence that: (1) counsel's performance was deficient; and (2) counsel's deficient performance prejudiced the defendant. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Ex parte Ellis*, 233 S.W.3d 324, 330 (Tex. Crim. App. 2007); *Hernandez v. State*, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986). Unless the defendant makes both showings, it cannot be said that her conviction is rendered unreliable by a breakdown in the adversarial process. *Strickland*, 466 U.S. at 687.

To establish deficient performance, a defendant must show that counsel's conduct fell below an objective standard of reasonableness. *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland*, 466 U.S. at 687). We review the effectiveness of counsel in light of the totality of the representation and the circumstances of each case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). In most cases, an undeveloped record on direct appeal is insufficient to satisfy the requirements of *Strickland* because the reasonableness of counsel's decisions often involves facts not appearing in the appellate record. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003).

To satisfy the second prong of the *Strickland* test, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. (citing *Strickland*, 466 U.S. at 692). A reasonable probability is a "probability sufficient to undermine confidence in the outcome," meaning "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009) (citing *Strickland*, 466 U.S. at 687, 694). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. In other words, we will not reverse a conviction based on ineffective assistance of counsel unless the alleged defects in counsel's performance undermine our confidence in the jury's verdict. *See Tapps v. State*, 257 S.W.3d 438, 451 (Tex. App.—Austin 2008), *aff'd on other grounds*, 294 S.W.3d 175 (Tex. Crim. App. 2009).

Even were we to assume that counsel was deficient in failing to file a motion to suppress Snokhous's refusal to submit a blood specimen, this would not undermine our confidence in the jury's verdict. We have already summarized the extensive evidence tending to show that Snokhous was operating a motor vehicle while intoxicated. We cannot conclude on this record that, if the evidence of Snokhous's refusal to submit a blood specimen had been suppressed, there is a reasonable probability that the result of the proceeding would have been different.

We overrule Snokhous's second point of error.

## CONCLUSION

We affirm the judgment of the trial court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton;
    Concurring Opinion by Justice Patterson

Affirmed

Filed:   May 14, 2010

Do Not Publish